UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

MICHAEL RHYNES,
Plaintiff,

Case No. 6:25-cv-6174

**SECOND AMENDED COMPLAINT**

-- against --

Jury Trial Demanded

THE CITY OF ROCHESTER, THE ROCHESTER CITY POLICE DEPARTMENT, THE MONROE COUNTY DISTRICT ATTORNEY, MONROE COUNTY, CRESSIDA A. DIXON, MONROE COUNTY PUBLIC ADMINISTRATOR, AS TEMPORARY ADMINISTRATOR OF THE ESTATE OF LOUIS J. TROTTO (deceased), and CRESSIDA A. DIXON, MONROE COUNTY PUBLIC ADMINISTRATOR, AS TEMPORARY ADMINISTRATOR OF THE ESTATE OF WILLIAM J. BARNES (deceased), and BRIAN LAUDADIO, MONROE COUNTY PUBLIC ADMINISTRATOR AND TEMPORARY ADMINISTRATOR OF THE ESTATE OF CHARLES R. SCHAFER (deceased), and SHEILA G. JACKSON, AS EXECUTRIX OF THE ESTATE OF  JULIAN P. JACKSON (deceased), and   LEONARD BORIELLO, LOUIS J. ROTUNNO,  LYNN R. PRESCOTT, GARY SEXTONE, DOUGLAS STODDART, MICHAEL GARNER, CHARLES SIRAGUSA, AND JOHN/JANE DOE NOS. 1 THROUGH 10, BEING UNKNOWN EMPLOYEES OF THE CITY OF ROCHESTER AND/OR MONROE COUNTY.
                                    Defendants.

-------------------------------------------------------------------------X

Plaintiff MICHAEL RHYNES, by and through his attorney Edelstein & Grossman and Pierre

Sussman, Esq,, complaining of defendants THE CITY OF ROCHESTER,  THE ROCHESTER

CITY POLICE DEPARTMENT, THE MONROE COUNTY DISTRICT ATTORNEY,

MONROE COUNTY, MONROE COUNTY PUBLIC ADMINISTRATOR CRESSIDA A.

DIXON AS TEMPORARY ADMINISTRATOR OF THE ESTATE OF ROCHESTER POLICE

OFFICER WILLIAM J. BARNES,  ROCHESTER POLICE OFFICER LEONARD

BORIELLO,  SHEILA G. JACKSON AS EXECUTRIX OF THE ESTATE OF  ROCHESTER

1

POLICE OFFICER JULIAN P. JACKSON,  ROCHESTER POLICE OFFICER LOUIS J. ROTUNNO, ROCHESTER POLICE OFFICER LYNN R. PRESCOTT, ROCHESTER POLICE OFFICER GARY SEXTONE, MONROE COUNTY PUBLIC ADMINISTRATOR CRESSIDA A. DIXON AS TEMPORARY ADMINISTRATOR OF THE ESTATE OF ROCHESTER DETECTIVE LIEUTENANT LOUIS JOHN TROTTO, MONROE COUNTY ASSISTANT DISTRICT ATTORNEY DOUGLAS STODDART, ASSISTANT DISTRICT ATTORNEY MICHAEL GARNER,  ASSISTANT DISTRICT ATTORNEY CHARLES SIRAGUSA, BRIAN LAUDADIO, MONROE  COUNTY PUBLIC ADMINISTRATOR AND TEMPORARY ADMINISTRATOR OF THE ESTATE OF CHARLES R. SCHAFER, AND JOHN/JANE DOE NOS. 1 THROUGH 10,  being unknown employees of the CITY OF ROCHESTER and/or MONROE COUNTY, hereby alleges upon information and belief as follows:

## INTRODUCTION

This is a civil rights action, pursuant to 42 U.S.C. Sections 1983 and 1988, seeking compensatory damages for the conduct of the defendants, all employed by and/or in supervision of the ROCHESTER CITY POLICE DEPARTMENT and/or THE MONROE COUNTY DISTRICT ATTORNEY, in knowingly fabricating and presenting perjured witness testimony and deceiving a jury into wrongfully convicting Plaintiff of murdering Enrico Ferrari and Robert Hurysz during a robbery. The defendants' indefensible actions, resulting from an embedded and continuously-enforced culture of misconduct at the ROCHESTER POLICE DEPARTMENT and the MONROE COUNTY DISTRICT ATTORNEY, caused plaintiff, a young man just 25 years old, to spend the next thirty nine years of his life in state prison.

2

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff MICHAEL RHYNES is a natural person residing in Tompkins County, New York.  At the times relevant to the lawsuit, RHYNES resided in Rochester and Monroe County, New York.

2.      Defendant CITY OF ROCHESTER is, and was at all times relevant to this action, a municipal entity and political subdivision existing under and by virtue of the laws of the State of New York, with the powers and duties imposed by law thereon.

3.      Defendant ROCHESTER CITY POLICE DEPARTMENT is, and was at all times relevant to this action, an agency of defendant CITY OF ROCHESTER existing under and by virtue of the laws of the State of New York, with the powers and duties imposed by law thereon.

4.      Defendant MONROE COUNTY is, and was at all times relevant to this action, a municipal entity and political subdivision existing under and by virtue of the laws of the State of New York, with the powers and duties imposed by law thereon.

5.      Defendant MONROE COUNTY DISTRICT ATTORNEY is, and was at all times relevant to this action, an agency of defendant COUNTY existing under and by virtue of the laws of the State of New York, with the powers and duties imposed by law thereon.

6.      The District Attorney ("D.A."), Assistant District Attorneys of Monroe County ("ADAs" or "prosecutors"), and District Attorney's Office Investigators are agents and employees of the COUNTY.

7.      ROCHESTER POLICE OFFICER LEONARD BORIELLO was, and at all times relevant to this action, an officer employed by the Rochester City Police Department, having the

3

powers and duties imposed by law thereon. At all times, BORIELLO was acting in the scope of his employment with the city and under color of state law.

8. Defendant CRESSIDA A. DIXON, MONROE COUNTY PUBLIC ADMINISTRATOR, AS TEMPORARY ADMINISTRATOR OF THE ESTATE OF ROCHESTER POLICE OFFICER WILLIAM J. BARNES (deceased) ("BARNES' ESTATE") is the Monroe County Surrogate Court appointed temporary administrator of the estate of ROCHESTER POLICE OFFICER WILLIAM J. BARNES ("BARNES") who was, and at all times relevant to this action, an officer employed by the Rochester City Police Department, having the powers and duties imposed by law thereon. At all times, BARNES was acting in the scope of his employment with the city and under color of state law.

9. Defendant SHEILA G. JACKSON AS EXECUTRIX OF THE ESTATE OF ROCHESTER POLICE OFFICER JULIAN P. JACKSON ("JACKSON'S ESTATE") is the widow of JULIAN P. JACKSON, who was, and at all times relevant to this action, an officer employed by the ROCHESTER CITY POLICE DEPARTMENT, having the powers and duties imposed by law thereon. At all times, JACKSON was acting in the scope of his employment with the city and under color of state law.

10. ROCHESTER POLICE OFFICER GARY SEXTONE was, and at all times relevant to this action, an officer employed by the Rochester City Police Department, having the powers and duties imposed by law thereon. At all times, SEXTONE was acting in the scope of his employment with the city and under color of state law.

11. ROCHESTER POLICE OFFICER LOUIS J. ROTUNNO was, and at all times relevant to this action, an officer employed by the Rochester City Police Department, having the

4

powers and duties imposed by law thereon. At all times, ROTUNNO was acting in the scope of his employment with the city and under color of state law.

12. ROCHESTER POLICE OFFICER LYNN R. PRESCOTT was, and at all times relevant to this action, an officer employed by the Rochester City Police Department, having the powers and duties imposed by law thereon. At all times, PRESCOTT was acting in the scope of his employment with the city and under color of state law.

13. Defendant CRESSIDA A. DIXON, MONROE COUNTY PUBLIC ADMINISTRATOR, AS TEMPORARY ADMINISTRATOR OF THE ESTATE OF ROCHESTER DETECTIVE LIEUTENANT LOUIS J. TROTTO ("TROTTO'S ESTATE") is the Monroe County Surrogate Court appointed temporary administrator of the estate of ROCHESTER DETECTIVE LIEUTENANT LOUIS J. TROTTO ("TROTTO") who was, and at all times relevant to this action, an officer employed by the Rochester City Police Department, having the powers and duties imposed by law thereon. At all times, TROTTO was acting in the scope of his employment with the city and under color of state law.

14. Defendant CHARLES SIRAGUSA was, and at all times relevant to this action, an assistant district attorney employed by the Monroe County District Attorney's Office, having the powers and duties imposed by law thereon. At all times, SIRAGUSA was acting in the scope of his employment with the county and under color of state law.

15. Defendant MICHAEL GARNER was, and at all times relevant to this action, an assistant district attorney employed by the Monroe County District Attorney's Office having the powers and duties imposed by law thereon. At all times, GARNER was acting in the scope of his employment with the county and under color of state law.

16. Defendant DOUGLAS STODDART was, and at all times relevant to this action, an assistant district attorney employed by the Monroe County District Attorney's Office having the powers and duties imposed by law thereon. At all times, STODDART was acting in the scope of his employment with the county and under color of state law.

17. Defendant BRIAN LAUDADIO, MONROE COUNTY PUBLIC ADMINISTRATOR AND VOLUNTARY ADMINISTRATOR OF THE ESTATE OF CHARLES R. SCHAFER (deceased) ("SCHAFER'S ESTATE") is the Monroe County Surrogate Court appointed temporary administrator of the estate of CHARLES R. SCHAFER, who was, and at all times relevant to this action, a staff investigator employed by the Monroe County District Attorney's Office, as a former police officer in the Rochester City Police Department having the powers and duties imposed by law thereon. At all times, SCHAFER was acting in the scope of his employment with the county and under color of state law.

18. Defendants JOHN/JANE DOE NOS. 1 THROUGH 10 were, and were at all times relevant to this lawsuit, officers employed by the Rochester City Police Department and/or the Monroe County District Attorney, having the powers and duties imposed by law thereon, and were acting in the scope of their employment with the county and/or the city and under color of state law.

19. At all times material to this complaint, DA Howard A. Relin, the ADAs, police officers and DA investigators involved in violating plaintiff's constitutional rights, and all individuals who acted in concert with them to do so, were acting in the course and scope of their employment and were acting under color of the law, statutes, ordinances, customs and usage of the State of New York, County of Monroe and/or the City of Rochester, the Rochester City Police Department and within the scope of their employment.

20.     At all times relevant to this lawsuit, the defendants conspired and acted in concert with each other.

21.     This is an action under Title 42, Sections 1983 of the United States Code in which plaintiff RHYNES alleges that he was deprived under color of law of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States by reason of the defendants' subornation of perjury, coaching or coercion of false identification and false testimony, intimidation and threatening of defense witnesses, fabrication of evidence, failure to investigate exculpatory evidence, failure to disclose exculpatory evidence and/or false discrediting of exculpatory evidence that resulted in him being incarcerated for more than 39 years for a murder he didn't commit.  Plaintiff also brings claims under New York State law for false imprisonment; malicious prosecution; negligent hiring, retention, training, discipline and supervision; and common-law negligence predicated upon the same acts and transactions as the aforesaid Federal constitutional claims.

22.     This Court has jurisdiction over the Federal claims pursuant to 28 U.S.C. § 1331 and over the related state law clams pursuant to 28 U.S.C. § 1367.

23.     Venue is proper in the Western District of New York pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District, and more particularly in the County of Monroe.

## NOTICE OF CLAIM

24.     A written Notice of Claim was filed with the both CITY OF ROCHESTER and COUNTY OF MONROE on MARCH 21, 2024.  More than thirty days have elapsed since the filing of said Notices of Claim and these matters have not been settled or otherwise resolved.

25.     Plaintiff has submitted to an examination under oath pursuant to Section 50-h of the New York General Municipal Law and has complied with any and all other conditions precedent to suit against the both CITY OF ROCHESTER and COUNTY OF MONROE.

**JURY DEMAND**

26.     Plaintiff hereby demands trial by jury of all issues raised in this Complaint.

**STATEMENT OF RELEVANT FACTS**

27.     On September 27, 1984, around 6 p.m., Enrico Ferrari and Robert Hurysz were shot to death during the course of an armed robbery by three masked men of Rico's Bar on Lexington Avenue in Rochester, New York.  At this time, MICHAEL RHYNES was sleeping in an upstairs bedroom in his mother Carrie Rhynes' house, located at 12 Kappel Place, Rochester, New York.

**THE ROCHESTER CITY POLICE DEPARTMENT INVESTIGATION**

28.     During the Rochester City Police investigation led by RPD Lieutenant William Mayer, none of the persons present in Rico's Bar could identify RHYNES as one of the perpetrators. These eyewitnesses agreed that the three assailants were black men wearing masks but little more. In fact, Diane LaFredo gave the most complete descriptions – describing the assailants' clothing – including the gloves worn by two of the men - by color, but LaFredo said all three men were six foot tall or taller and RHYNES is a comparatively diminutive 5' 6" tall.

29.     Upon information and belief, on September 27, 1984, Rochester City Police officers assembled a suspect list for the murders and attempted robbery, which included over 30 names, including RHYNES. *Thus, it is clear RHYNES was a target from the beginning, even though police had no verifiable information he was involved.*

8

30.    In an article titled, "Bar Owner, customer slain in gunfire 'like OK Corral'" published on the front page of the morning edition of the September 28, 1984 Rochester Democrat and Chronicle, the three gunmen are described "wearing long, dark nylon jackets and stockings over their heads," and with one gunman armed with a "0.16 gauge shotgun" while the other two gunmen were armed with "handguns."  Mayer is quoted in the article saying that "The suspects – like all the regulars at Rico's – probably knew Ferrari kept extra money on Thursdays to cash paychecks for local factory workers," and Mayer further told reporters that the suspects knew the layout of the bar and where the safe was. Additionally, Mayer stated that the suspects sped off in a car and asked the reporters to print the Rochester Police main phone number at 528-6666 for witnesses who may have seen the getaway and/or had seen the robbers.

31.    Upon information and belief, RPD officers canvassed the Hollywood Bar for RHYNES on September 30, 1984. Shortly afterwards, Mayer directed RPD officers to prepare memoranda stating that RHYNES committed the robbery.

32.    Upon information and belief, sometime between September 27 and October 3, 1984, Mayer, knowing he could not advance the investigation based on these imprecise and conflicting eyewitness accounts, contacted Ali  Hasan, a paroled felon and, upon information and belief, a confidential informant for the Rochester Police Department and the FBI.

33.    At all times relevant to this complaint, Ali Hasan was convicted after guilty plea in this court on October 20, 1981 to conspiracy to distribute counterfeit United States currency, for which he was sentenced to three years suspended prison term and three more years of probation..

34. Upon information and belief, the RPD knew that Hasan was under federal indictment on or before September 28, 1984.

35. Beginning on or around September 28, 1984, ROTUNNO, JACKSON, BARNES, and TROTTO conducted canvasses of potential witnesses. Upon information and belief, Mayer directed them to interview Hasan on September 28, 1984.

36. Sometime between September 28, 1984, and October 1, 1984, RPD officers JACKSON and TROTTO and R.P.D. Detective James Verna interviewed Hasan at his home. Upon information and belief, JACKSON and TROTTO brought a picture of plaintiff RHYNES and instructed Hasan to implicate RHYNES in the robbery.

37. Upon information and belief, TROTTO, JACKSON, and/or Verna fed information about plaintiff RHYNES to Hasan and coached and/or coerced Hasan to concoct a story about a supposed chance early September 1984 street encounter with three black men, including one he only identified as "Joe-Joe". During this supposed encounter, the three men and Hasan smoked marijuana in Hasan's car and the three men stated that they knew that they could get money from a bar called Rico's. In an investigatory memorandum dated October 1, 1984, RPD officer James Verna recorded that Hasan viewed photos and falsely recorded that Hasan spontaneously identified a photo of MICHAEL RHYNES as "Joe-Joe".

38. Upon information and belief, ROTUNNO, JACKSON, and/or TROTTO met with Hasan again on October 3, 1984 and one or all of them coerced Hasan to execute an affidavit. During this meeting, JACKSON ordered Hasan to falsely identify "MICHAEL" in a photo array. JACKSON falsely recorded this meeting in an investigatory memorandum dated October 11, 1984.

10

The report stated that Hasan's Affidavit was completed on October 3, 1984, conflicting with the actual date of the affidavit, which has a date of October 5, 1984 in its plain writing.

39.   On or about October 5, 1984, members of the Rochester Police Department, including, upon information and belief, RPD Investigators JACKSON, ROTUNNO, and RPD officer PRESCOTT interviewed Annie Jean Maddox and Vernessa Maddox, who denied knowledge of the crime. They then forced Annie Jean Maddox and Vernessa Maddox to travel to the Rochester Public Safety Building where they were confined apart in separate rooms. In the hours until after midnight, JACKSON, STEWART, TROTTO, PRESCOTT and ROTUNNO and unknown other RPD officers forced Annie Jean Maddox and Vernessa Maddox to falsely identify plaintiff RHYNES as a participant in the robbery and murders with physical violence and threats of criminal arrest, and forced removal of their children.

40.   At all times relevant to this complaint, Annie Jean Maddox was under a sentence of probation for a June 14, 1983 conviction after her guilty plea for felony grand larceny and misdemeanor welfare fraud through false statements.  Also at all times relevant to this complaint, Annie Jean Maddox was subject to arrest under a June 3, 1984 warrant for violating her probation sentence under the June 14, 1983 conviction, for which she pled guilty on November 20, 1984, and sentenced to restoration to probation. Upon information and belief, Annie Jean Maddox's probation sentence continued through to the end of 1986.

41.   As a result, on or about October 6, 1984, both Maddox sisters signed false statements identifying plaintiff RHYNES in the Rico's Bar robbery and murders. JACKSON and/or and unknown other RPD officers further falsely recorded the Maddox sisters' identification of plaintiff RHYNES in the photo array. Trotto countersigned Annie Jean Maddox's affidavit on

October 5, 1984 just before midnight, and ROTUNNO countersigned Vernessa Maddox's affidavit after midnight on October 6, 1984.

42. Also on October 5, 1984, TROTTO, ROTUNNO, and JACKSON brought Hasan to RPD headquarters and coerced and/or coached Hasan to sign an affidavit identifying plaintiff RHYNES as a participant in planning the Rico's Bar robbery.

43. On the basis of these false and coerced identifications, TROTTO and/or unknown other RPD officers ordered the arrest without probable cause of plaintiff RHYNES. Subsequently RPD Officers SEXTONE, BORIELLO AND BARNES arrested plaintiff RHYNES, who brought him to the Monroe County Public Safety building, and charged him in the Rico's Bar robbery and murders.

44. Upon information and belief, defendants coerced Annie Jean Maddox and Vernessa Maddox to testify to the false statements on October 9, 1984 before a grand jury empaneled on October 6, 1984.

**THE MONROE COUNTY DISTRICT ATTORNEY WORKS WITH THE RPD IN PLAINTIFF'S WRONGFUL CONVICTION.**

45. Upon information and belief, defendants MICHAEL GARNER further coerced Annie Jean Maddox and Vernessa Maddox to testify to the false statements on October 9, 1984 before a grand jury empaneled on October 6, 1984.

46. Upon information and belief, defendant MICHAEL GARNER knowingly presented the false testimony of Hasan to the grand jury on October 10, 1984. During that testimony, Hasan and GARNER had the following exchange:

GARNER: Do you know whose was photograph that you selected?
HASSON: Michael.

GARNER: Do you know Michael by any other name?

HASSON: Jo-Jo, but now I don't know whether that's another name other people call him or whether that's the name I call him 'cause at first I called him Jo-Jo so long I forgot his name was Michael and then after this happened a couple days I was thinking about him and for some reason the name Michael or Mike jumped into my mind so I guess I remember his real name.

47.    Upon information and belief, defendant MICHAEL GARNER knowingly presented the false testimony of JULIAN JACKSON to the grand jury on October 9 and 11, 1984. Specifically, on October 9, 1984, under questioning from GARNER, JACKSON testified that at four pm on October 5, 1984, JACKSON presented a photo array (Grand Jury Exhibit #3) with a picture of RHYNES to Vernessa Maddox and JACKSON testified that Maddox identified the second portrait on the array as "Mike."

48.    Through the coaching and/or coercion of Ali Hasan's, Ms. Annie Jean Maddox's, and Ms. Vernessa Maddox's perjured testimony before the grand jury, Defendants  TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 through 10 in the employ of the ROCHESTER POLICE DEPARTMENT, ADA GARNER and/or JOHN/JANE DOE NOS. 1 through 10 in the employ of the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE and RPD caused RHYNES to be indicted without probable cause and through manipulation and fraud for two counts of second degree murder and five counts of first degree robbery on October 12, 1984, which also charged Adrian Jackson and Jesse Hammock.

49.    The next day, Vernessa Maddox recanted both the October 6, 1984 affidavit and her grand jury testimony, in a sworn affidavit notarized on October 12, 1984. In that affidavit, Vernessa Maddox recounted her arrest, isolation, physical intimidation, and the express threats of

13

arrest and threats to take her children employed by JACKSON, ROTUNNO, and TROTTO and other unknown ROCHESTER CITY POLICE OFFICERS to force her to sign the false statement.

50. On November 25, 1984, Thurmond Dicker was arrested by RPD officers and gave an oral statement to arresting officers police describing his involvement in several crimes including the attempted robbery and murders at Rico's Bar. Dicker was taken to the Physical Crimes office on the fourth floor of the Public Safety Building on the morning of November 26, 1984, where CHARLES SIRAGUSA, Monroe County first assistant district attorney, knowing that Dicker was to be charged with both murder and robbery, coerced and/or coached and offered Dicker to plea to lesser charges of attempted robbery in exchange for Dicker's testimony at trial of the already indicted Jesse Hammock, Adrian Jackson, and RHYNES for the Rico's Bar murders. Dicker stated that he had driven the getaway car but had not entered the bar. RPD Investigators LEONARD BORRIELLO and David Schue, RPD Stenographer Paul Messina, FBI Agent John E. Kszysztyniak were also present.

51. A.D.A. GARNER suspected that Dicker's involvement in the Rico's Bar robbery was greater than his November 26, 1984 admissions, and he ordered Rochester City Police Officer LYNN PRESCOTT to examine Dicker under polygraph on January 14, 1985, which indicated that Dicker had been untruthful as to the extent of his involvement in the Rico's Bar shootings, and GARNER knew he could not rely on Dicker's testimony to implicate RHYNES.

52. On or about March 1, 1985, RPD investigators BORRIELLO and BARNES interrogated and, upon information and belief coerced and or coached Cleavon Clark, an associate of Dicker, who was in custody in the Wayne County Jail, promising non-prosecution for any crimes Clark admitted in return for Clark's false testimony that he had planned and prepared for

14

the Rico's Bar robbery with plaintiff RHYNES. Clark provided the narrative BORRIELLO and BARNES sought, but declined to sign the transcript of his interrogation.

53.     In a September 25, 1985, Probable Cause and Wade Hearing before Judge Robert Kennedy, J., upon information and belief, GARNER presented the false testimony of ROTUNNO and JACKSON.   Under questioning from GARNER, JACKSON falsely testified that, upon information from RPD Lieutenant Mayer, JACKSON met with Ali Hasan on OCTOBER 3, 1984 and that he had not met Hasan prior to then. JACKSON falsely testified that he did not know that Hasan would have information about RHYNES.   Upon information and belief, JACKSON falsely testified that Hasan volunteered knowledge about the robbery, implicated and identified RHYNES by name and from a photo array as a participant in the discussion about robbing Rico's Bar robbery free of coercion and/or coaching.

54.     Upon information and belief, JACKSON falsely testified that that ANNE MADDOX, Vernessa Maddox, and Hasan volunteered knowledge of the robbery and implicated Michael Rhynes free of coercion in a September 25, 1985 Wade Hearing

55.     Upon information and belief, ROTUNNO falsely testified that Vernessa Maddox gave a statement and identified RHYNES free of coercion and/or coaching.

56.     On or about December 20, 1985, ADA DOUGLAS STODDART met with and, upon information and belief coached and/or coerced Cleavon Clark in implicating plaintiff RHYNES.  STODDART presented Clark with signed assurances of non-prosecution for crimes he described in the previous interrogation, and STODDART further promised that the MONROE COUNTY D.A. would intervene with the New York State Department of Corrections to assure that Clark would remain segregated from Dicker, Adrian Jackson, Jesse Hammock (all of whom

15

had been or would be indicted for the Rico's Bar incident), and RHYNES while in prison. Clark signed the transcript of his interrogation.

57. On January 13, 1986 during Adrian Jackson's trial, Clark recanted his March 1, 1985, statements under direct and cross examination, saying he had lied to police, admitting only to driving Dicker to Utica after the robbery.

58. In retaliation, STODDART repudiated his December 20, 1985 promise to segregate Clark in a January 22, 1986 letter.

59. On or about October 24, 1985, MONROE COUNTY DISTRICT ATTORNEY INVESTIGATOR CHARLES SCHAFER wrote a memo to ADA GARNER stating that Vernessa Maddox and Anne Jean Maddox were unwilling to talk to representatives from the MCDA's office.

60. Later on, before RHYNES' trial, SCHAFER also sent STODDART a memorandum listing all of the children of the three Maddox sisters: Tillie, Anne, and Vernessa.

61. On February 13, 1986, DA Howard A. Relin subpoenaed Vernessa Maddox to testify at the trial of co-defendant Jesse Hammock.  The subpoena was served by MCDA Investigator SCHAFER. On February 18, 1986, Vernessa Maddox recanted her grand jury testimony implicating RHYNES under direct examination by DA Relin. At Hammock's trial, DA Relin immunized Vernessa Maddox from charges of perjury and Maddox testified that she *did not* see RHYNES on September 28, 1984, and had not seen him any time during the four day period beginning on the 27th. After this recantation, the initial case against RHYNES collapsed.

62. On April 16, 1986, after acknowledging the fact Mr. Clark and Ms. Maddox had recanted and further acknowledging that they now had "grave doubts about [the] credibility," of the third witness (upon information and belief: Hasan), STODDART consented to a defense

16

motion to dismiss the indictment, stating that they were left with "insufficient evidence" to try RHYNES.

63.    On June 3, 1986, the Court denied the motion and directed the People to go ahead regardless.

64.    The difficulties that the MONROE COUNTY DISTRICT ATTORNEY'S office were having in regards to witness recantations and the prosecution of RHYNES were reported in the Rochester Democrat and Chronicle in articles published on April 17, April 18, and May 9, 1986.

65.    On or around the beginning of June, 1986, Roy Timmons, contacted Monroe County Investigator CHARLES R. SCHAFER, whom Timmons knew separately from SCHAFER'S RCPD work (upon information and belief, SCHAFER had also visited Timmons' mother's illegal speakeasy bar during Timmons' childhood), by offering to recite untruthfully that RHYNES had confessed his participation in the Rico's Bar robbery and murders in conversations with Timmons while they were together in Monroe County Jail in 1984.

66.    Timmons heard back from SCHAFER immediately and had a meeting with him, during which SCHAFER and, upon information and belief, a JOHN/JANE DOE ROCHESTER CITY POLICE OFFICER coached and/or coerced Timmons and fed Timmons details of the botched robbery and murders which Timmons falsely stated that RHYNES had told to him in jail conversations.  Upon information and belief, at the meeting, SCHAFER told Timmons that they had nothing on RHYNES, and that, if Timmons could put RHYNES as the shooter, he could go home.

17

67. This statement was false because Timmons had never spoken to RHYNES at the jail and RHYNES never told him anything about the case.

68. SCHAFER scheduled a second meeting attended by SCHAFER, STODDART, SIRAGUSA, Timmons, Timmons' attorney Margaret Burt, a JOHN/JANE DOE ROCHESTER CITY POLICE OFFICER and the JOHN/JANE DOE ADA on Timmons' case. During this meeting, Timmons did not offer any details on his own, just the details SCHAFER supplied to him. SCHAFER had told him that RHYNES was the shooter, Timmons reiterated that and that's what SCHAFER, STODDART, and/or SIRAGUSA said he should go with. Timmons' statements were fabricated with the active and eager assistance of SCHAFER, SIRAGUSA, STODDART, JOHN/JANE DOE ROCHESTER CITY POLICE OFFICER and the JOHN/JANE DOE ADA in Timmons' case, who knew or should have been known their falsity.

69. SCHAFER, STODDART, SIRAGUSA, and Relin arranged for Timmons to be immediately released from the Monroe County Jail In return for his statement and testimony. Relin and other defendants and employees of the MONROE COUNTY DISTRICT ATTORNEY' OFFICE dismissed Timmons' pending robbery charges after false trial testimony on August 12, 1986. SCHAFER also gave Timmons $150.

70. Timmons met with officers from the MONROE COUNTY DISTRICT ATTORNEY'S office afterwards several times afterwards in which those officers continued to encourage, coach and mold Timmons' false testimony.

71. Joseph C. Smith, serving a sentence at Mid-State Correctional Facility in Marcy, NY, contacted D.A. Relin by letter in early June 1986. In that letter, Smith wrote that he had read in the Rochester newspaper that the MONROE COUNTY DISTRICT ATTORNEY lacked

evidence against RHYNES. Smith falsely stated he had information needed to convict RHYNES based on conversation they had purportedly had while he and RHYNES were together at the Monroe County Jail. Smith offered this false information in return for lenient treatment on a pending re-sentencing for a burglary charge. None of Smith's statements were true since RHYNES had told him nothing about his case. Soon after receiving the letter, D.A. Relin dispatched SCHAFER with a JOHN/JANE DOE ADA and a JOHN/JANE DOE ROCHESTER CITY POLICE OFFICE, to Mid-State Correctional to interview Smith.

72. At the meeting, Smith actually did not know anything because plaintiff RHYNES had not made any admissions to him. Thus, at this meeting, SCHAFER and the other law enforcement officers fed all the significant details of the crime and plaintiff RHYNES' false involvement and Smith just agreed to all of the suggestions and details provided by SCHAFER, the JOHN/JANE DOE ADA and JOHN/JANE DOE ROCHESTER CITY POLICE OFFICER.

73. The interview resulted in a written statement dated June 5, 1986, which was signed by Smith and by SCHAFER. This statement was based on the story Smith had discussed earlier and was not accurate and was fabricated by and/or known or should have been known by the law enforcement authorities not to be accurate. As a result of his false testimony, Smith was allowed to vacate a previous plea in a burglary case and allowed to plea to a lesser charge and received a significantly reduced sentence.

74. As a result of coercion, coaching, and fabricated information and other unconstitutional misconduct by defendant members of the ROCHESTER CITY POLICE DEPARTMENT and the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE, RHYNES flawed case was allowed to proceed, ROCHESTER POLICE OFFICERS ROTUNNO AND JACKSON falsely testified at Plaintiff's pre-trial hearing, Anne Maddox, Ali Hasan gave false and

19

perjured testimony implicating RHYNES in the Rico's robbery and murders, and both Joe Smith and Roy Timmons gave false and perjured testimony against RHYNES at trial – both testifying in sum and substance that RHYNES had admitted to them his participation in the robbery and murders at Rico's bar.

75.    At no time did GARNER, STODDART, SCHAFER, SIRAGUSA, or any other officer or employee of the MONROE COUNTY DISTRICT ATTORNEY or any member of the ROCHESTER POLICE DEPARTMENT disclose to plaintiff the convictions of Ali Hasan and Annie Jean Maddox for felony crimes of dishonesty.

76.    The false testimony given by Timmons and Smith was the sole evidence against RHYNES: there was no other evidence pointing to him: no eyewitnesses, no admissions or confessions, no forensic evidence, and no video footage.  In addition, as was well known to defendants and other employees of the CITY OF ROCHESTER, THE ROCHESTER CITY POLICE DEPARTMENT, MONROE COUNTY DISTRICT ATTORNEY'S OFFICE and MONROE COUNTY, Timmons' and Smith's trial testimony was contrary to all the other testimony presented by Vernessa Maddox and Cleavon Clark in the trials of Adrian Jackson and Jesse Hammock. In addition, ADA STODDART presented what he knew of should have known was the false testimony of Ali Hasan and Ann Maddox, which, although not directly inculpatory, contributed to the falsity of the conviction.  Furthermore, officials of the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE knew that Joe Smith had written to their office several times in the years following the trial repudiating his trial testimony.

77.    RHYNES was convicted of the crime based solely on the perjured testimony which was coerced and fabricated by the defendants in the ROCHESTER POLICE DEPARTMENT and by Investigator SCHAFER, ADAs STODDART and/or SIRAGUSA and/or

20

other members of the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE (JOHN/JANE DOES 1-10) as explained above. Moreover, upon information and belief, the defendants in the ROCHESTER POLICE DEPARTMENT and defendants in the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE failed to turn documentation, instances of prior convictions, specifically those of Ann Maddox and Hasan, and other evidence of the false statements that was exculpatory and was required to be disclosed to RHYNES and his criminal defense attorney pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963), *Giglio* v. *United States*, 405 U.S. 150, (1972), and their progeny, resulting in the failure to inform plaintiff's counsel in particular of the fact that witnesses had been coached, fed information and coerced. Moreover, Officers and employees of the MONROE COUNTY DISTRICT ATTORNEY withheld from RHYNES until many years after the trial that both Joe Smith and Roy Timmons had falsely testified. Officers in the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE withheld from RHYNES that Smith had repudiated his trial testimony.

78. On August 15, 1986, RHYNES was convicted of four counts of murder in the second degree five counts of attempted robbery and on October 24, 1986, was sentenced to an aggregate term of incarceration of 50 years to life imprisonment. RHYNES commenced service of his sentence immediately.

**RHYNES FIGHTS FOR AND EVENTUALLY PROVES HIS INNOCENCE**

79. RHYNES direct appeal and his various post-conviction motions were consistently denied by the courts. However, on August 16, 2022, RHYNES filed a C.P.L. § 440.10 motion to vacate his conviction in the Monroe County Supreme Court, arguing, *inter alia,* that newly discovered evidence mandated vacatur of his conviction. As exhibits to the motion,

21

RHYNES proffered two affidavits from Joe Smith and Roy Timmons, the two jailhouse informants who affirmed that they had lied at RHYNES' trial that RHYNES had admitted to them his role in the murders and robbery at Rico's bar that and that they were recanting their testimony. They further affirmed that while they knew some basic facts about the case due to newspaper coverage of the case at the time, they were fed details about the case and told what to say by law enforcement authorities.

80.    On November 21, 2022, the Monroe County Supreme Court (Stephen T. Miller, J), ordered an evidentiary hearing on the motion.  As a result, Hon. Miller held a CPL article 440 hearing on January 19, 2023.  At the hearing, both jailhouse informant witnesses, Joe Smith and Roy Timmons, testified credibly and consistently with the affidavits.

81.    On December 8, 2023, the Monroe County Supreme Court (Stephen Miller, J.) issued an Order granting the branch of RHYNES' motion pursuant to C.P.L. § 440.10(1)(g) and vacated claimant's conviction on the grounds of newly discovered evidence.  Specifically, the court noted that after observing the demeanor of both Smith and Timmons, it found that their testimony was inherently believable and credible.  The court then found that these recantations constituted newly discovered evidence pursuant to CPL 440.10(g) and that created a probability that had such evidence been received at trial, the verdict would have been more favorable to the defendant.  On this note, the court explained that there was no direct evidence proving the guilt of defendant, and there was very little evidence at trial which corroborated the testimony of Mr. Smith and Mr. Timmons.

82.    RHYNES was released on his own recognizance on December 19, 2023, at the first hearing after the Order vacating his conviction was issued.  On January 8, 2024, the Monroe Count Court dismissed the indictment, causing the claims herein to accrue.

83. RHYNES was and is innocent of the crime of which he was convicted and suffered conviction and incarceration solely due to the unlawful and unconstitutional acts of the Defendants herein.

**THE MONROE COUNTY AND MONROE COUNTY DISTRICT ATTORNEY'S UNLAWFUL POLICY OF FAILING TO DISCLOSE EXCULPATORY INFORMATION AND PRESENTING FALSE EVIDENCE**

84. RHYNES' wrongful conviction was a result of DA Relin and ADAs SIRAGUSA, STODDART, GARNER, and/or JOHN/JANE DOE'S 1-10—pursuant to longstanding policy, practice and custom of the D.A.'s Office and COUNTY—failing to disclose *Brady* material and presenting false and misleading testimony at trial.

85. All of the acts by ADAs SIRAGUSA, STODDART, GARNER, DA Relin and other MONROE COUNTY DISTICT ATTORNEY officials described above were carried out pursuant to policies and practices of the COUNTY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and under the supervisory authority of the D.A.'s Office. Defendant COUNTY and the D.A.'s Office, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the defendant's wrongful acts; and/or failed to prevent or stop these acts; and/or allowed or encouraged these acts to continue. The COUNTY has a decades-long policy, practice and/or custom of hiding and/or suppressing exculpatory evidence and refusing to disclose *Brady* material to criminal defendants.

86. In fact, the COUNTY has a decades-long policy, practice and/or custom of refusing to discipline prosecutors who have hidden and/or suppressed exculpatory evidence and refused to disclose *Brady* material to criminal defendants.

23

87.    Instead, when employees of the D.A.'s Office have raised concerns about prosecutors hiding, suppressing and refusing to disclose *Brady* material to criminal defendants, the District Attorney and other supervising managerial employees of the office have retaliated against said employees.

88.    For example, The MONROE COUNTY DISTRICT ATTORNEY'S OFFICE and other D.A.'s Office supervising managerial personnel have fired employees who raised concerns that prosecutors were hiding, suppressing and/or refusing to disclose *Brady* material to criminal defendants during the same time they were prosecuting RHYNES. See, e.g., *Frank* v. *Relin*, 1 F.3d 1317, 1321 (2d Cir. 1993).

89.    On September 13, 1985, Victim Advocate Melinda Frank went to Monroe County ADA Louis Polito, an 11 year veteran head of the MCDA investigations office, to tell Polito of her concerns that an unnamed ADA in the MCDA was failing to disclose Brady material in the David Larsen murder prosecution.  Polito reported these Brady concerns to Judge Robert Kennedy, then supervising Judge in Monroe County Supreme Court – and the presiding judge in RHYNES' pre-trial hearings.

90.    Hon. Kennedy promptly called DA Relin to chambers and privately informed DA Relin of Polito's communication about the unnamed ADA.

91.    DA Relin returned to the MCDA and immediately fired Polito the same day for "not being loyal" in retaliation for Pilato informing Hon. Kennedy of the prosecutorial misconduct.

92.    On September 20, 1985, DA Relin fired Victim Advocate Frank in retaliation for the raising concerns about the same Brady violation.

93. On information and belief, the unnamed ADA prosecuting David Larsen was CHARLES SIRAGUSA, Relin's second-in-command. SIRAGUSA refused to interview witnesses whose testimony could potentially aid defendant Larson, who was being prosecuted for murder.

94. Relin's decision to retaliate against Franks and fire her for voicing concerns that the ADA handling the Larson case was potentially committing *Brady* violations constituted official COUNTY policy.

95. Relin's decision to retaliate against Pilato and fire him for reporting to Justice Kennedy that the ADA handling the Larson case was potentially committing *Brady* violations constituted official COUNTY policy.

96. Relin's decision to fire employees who reported potential *Brady* violations constituted official COUNTY policy to retaliate against employees who abide by their constitutional duty to disclose exculpatory and impeachment evidence, as required under *Brady* v. *Maryland*, 373 U.S. 83 (1963), *Giglio* v. *United States*, 405 U.S. 150, (1972), and their progeny.

97. The official COUNTY policy was affirmatively confirmed in September 1985 during RHYNES's prosecution and went unchanged thereafter until 2020.

98. Howard Relin was the District Attorney from 1983 until 2004.

99. At all times relevant herein, the official COUNTY policy was to win at all costs, including by violating the constitutional rights of criminal defendants.

100. Until approximately 2020, the Official COUNTY policy was that impeachment material related to prosecution witnesses did not have to be disclosed under *Brady* v. *Maryland*, 373 U.S. 83 (1963), *Giglio* v. *United States*, 405 U.S. 150, (1972), and their progeny.

101. Until approximately 2020, the Official COUNTY policy, instituted to win convictions at any and all cost, was that impeachment material related to prosecution witnesses did not constitute Brady material.

102. Recently, the D.A.'s Office has admitted that for decades, the official COUNTY policy was to suppress and/or refuse to disclose evidence related to a witness' credibility or veracity as required under *Brady*, *Giglio* and their progeny.

103. Until approximately the year 2020, the D.A.'s Office maintained a "don't ask, don't tell" policy regarding and impeachment materials, in which the office shirked its duty to actively gather and disclose any impeachment evidence of prosecution witnesses, as required under *Brady*, *Giglio* and their progeny.

104. In approximately 2020, the D.A.'s Office—for the first time—established a "*Giglio* committee" to attempt to collect impeachment material of prosecution witnesses for disclosure to criminal defendants and their attorneys.

105. Since 2020, the D.A.'s Office has sent letters to numerous criminal defense attorneys admitting that in prior criminal prosecutions, their office withheld exculpatory and/or impeachment evidence of prosecution witnesses.

106. In fact, in 2021, almost two years before Plaintiff's indictment was dismissed, the new District Attorney Sanda Doorley explicitly acknowledged the existence of the MONROE COUNTY DISTRICT ATTORNEY OFFICE's unconstitutional policy, practice and custom of failing to seek out and/or suppress exculpatory and impeachment evidence after her office agreed to vacate and dismiss the convictions of Jorge DeJesus Jr. and Ronnie Edmonds after it was found

26

that Monroe County prosecutors failed to disclose impeachment evidence concerning two police officers who provided testimony as prosecution witnesses. [1]

107.  In her September 2021 comments to the media about the Ronnie Edmonds case, D.A. Doorley acknowledged that her office had long been aware of the credibility problems of the two officers, but had notified defense lawyers about them.  Doorley further admitted that previously, the MONROE COUNTY DISTRICT ATTORNEY had no formal process to track impeachment evidence concerning prosecution witnesses and that they were now formalizing a process – explicitly acknowledging that her office – since at least the time of RHYNES' trial – had no process in place to prevent the type of unconstitutional violations that occurred in his case.

108.  Indeed, the MONROE COUNTY DISTRICT ATTORNEY OFFICE's policies and practices and customs regarding Brady violations, presenting false or misleading evidence during trials, and similar persistent prosecutorial misconduct are well known to the MONROE COUNTY and its policymakers as a result of numerous reported appellate decisions. [2]

---

[1] *See* Gary Craig, *Proof of police dishonesty leads to overturned conviction. Many more could follow*, DEMOCRAT & CHRON. (Sept. 1, 2021, 9:15 a.m.), https://www.democratandchronicle.com/story/news/2021/09/01/proof-of-police-dishonestyinvolving-rpd-officers-in-rochester-ny-leads-to-overturned-conviction/5654470001/.

[2] *See, e.g.*, *People v. Handy*, 20 N.Y.3d 663 (2013); *People v. Bradley*, 20 N.Y.3d 128 (2012); *People v. Horton*, 145 A.D.3d 1575 (4th Dept. 2016); *People v. Porter*, 136 A.D.3d 1344 (4th Dept 2016); *People v. Carver*, 114 A.D.3d 1199 (4th Dept 2014); *People v. Collier*, 114 A.D.3d 1136 (4th Dept 2014); *People v. Bernard*, 115 A.D.3d (4th Dept 2014); *People v. Gayden*, 111 A.D.3d 1388, 1389–90 (4th Dept. 2013); *People v. Davis*, 52 A.D.3d 1205 (4th Dept 2008); *People v. Harris*, 35 A.D.3d 1197 (4th Dept 2006); *People v. Valentin*, 1 A.D.3d 982, 982–83 (4th Dept. 2003).

109. Thus, GARNER'S, STODDART'S, and SIRAGUSA's unlawful acts resulted from and were taken pursuant to the explicit policy of the D.A.'s Office to hide and/or suppress exculpatory evidence and/or evidence related to a witness' credibility or veracity.

110. As a result of this policy to hide and/or suppress exculpatory evidence and/or evidence related to a witness' credibility or veracity, RHYNES was deprived of his constitutional right to MONROE COUNTY *Brady* material.

## THE MONROE COUNTY AND MONROE COUNTY DISTRICT ATTORNEY'S NOTICE OF THEIR UNLAWFUL POLICY

111. The MONROE COUNTY DISTRICT ATTORNEY'S OFFICE, as an agency of the defendant COUNTY, has a custom and practice of refusing to internally investigate, reprimand, sanction or discipline prosecutors for misconduct.

112. This custom and practice encourages, condones and ratifies prosecutors' deliberate and reckless disregard of their constitutional and ethical duties.

113. As a result of this practice and custom, ADAs GARNER, STODDART, and SIRAGUSA, Investigator SCHAFER and/or JOHN/JANE DOES 1-10, engaged in prosecutorial misconduct in a climate of impunity.

114. The Defendant County was on actual and constructive notice of the misconduct of District Attorney's Office prosecutors from at least the early 1980's through the date of RHYNES' release and the dismissal of the indictment, by numerous Appellate Court decisions that overturned verdicts due to prosecutorial misconduct, including Defendants' policy of withholding *Brady* material, which deprived numerous criminal defendants of their constitutional rights.

28

115.  During that same time period, the Appellate Division, Fourth Department issued numerous decisions commenting that Monroe County prosecutors engaged in prosecutorial misconduct, but nevertheless refused to reverse the conviction on that basis.

116.  Upon information and belief, the defendant County and the District Attorney's Office failed to discipline any of the prosecutors involved in the numerous instances of prosecutorial misconduct that caused convictions secured by the District Attorney's Office to be overturned between 1980 and 2020. [3]

117.  The existence of such unlawful *de facto* policies and/or well-settled and widespread customs and practices has been known to supervisory and policy-making officers and officials of the District Attorney's Office, including, without limitation, DA Relin and his predecessors in interest, for a substantial period of time.

118.  Upon information and belief, no discipline was imposed against the trial prosecutors in the following cases, which were either overturned on appeal due to prosecutorial misconduct, or where the appellate division admonished the trial prosecutor for their misconduct, prior to RHYNES' release:

---

[3]    Although many of the cases cited below occurred after plaintiff's trial, as noted above, the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE was in possession of letters for Joe Smith recanting his testimony long after his trial.  Moreover, it has been held that "[s]ubsequent events," and "lack of corrective action might also reflect a tacit policy of [the District Attorney's] part to condone whatever his subordinates deemed necessary to secure a conviction."  *Collins v. City of New York,* 923 F.Supp. 2d 462, 477-78 (E.D.N.Y. 2013); See also *Bordanaro v. McLeod,* 871 F.2d 1151, 1167 (1st Cir.1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."); *Henry v. County of Shasta,* 132 F.3d 512, 519 (9th Cir.1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.").

a. *People* v. *Flowers*, 151 A.D.3d 1843 (4th Dept. 2017) (admonished trial prosecutor for repeated misconduct in this case and other cases for improperly appealing to sympathies of the jury and denigrating defense counsel);

b. *People* v. *Mastowski*, 155 A.D.3d 1624 (4th Dept. 2017) (admonished prosecutor for summation misconduct);

c. *People* v. *Horton*, 145 A.D.3d 1575 (4th Dept. 2016) (prosecutor elicited false and misleading testimony and summation misconduct denied the defendant a fair trial);

d. *People* v. *Porter*, 136 A.D.3d 1344 (4th Dept. 2016) (prosecutor elicited false and misleading testimony and summation misconduct denied the defendant a fair trial);

e. *People* v *Wright*, 25 N.Y.3d 769 (2015) (summation misconduct);

f. *People* v. *Jones*, 134 A.D.3d 1588 (4th Dept. 2015) ("pervasive" and "egregious" summation misconduct);

g. *People* v. *Gibson*, 134 A.D.3d 1512 (4th Dept. 2015) (admonished for summation misconduct in this and other cases);

h. *People* v *Griffin*, 125 A.D.3d 1509 (4th Dept. 2015) (summation misconduct and "Perhaps most egregiously in this one-witness case where credibility was paramount, the prosecutor repeatedly and improperly vouched for the veracity of the complainant);

i. *People* v. *Jurs*, 51 Misc.3d 653 (County Ct. Monroe Co. 2015) (Summation misconduct);

j. *People v. Carver*, 114 A.D.3d 1199 (4th Dept 2014) (Belated disclosure of 911 call that identified another individual as the shooter, not the defendant, was a *Brady* violation);

k. *People v. Collier*, 114 A.D.3d 1136 (4th Dept 2014) (prosecutor elicited prejudicial and misleading testimony and engaged in summation misconduct that denied the defendant a fair trial);

l. *People v. Bernard*, 115 A.D.3d (4th Dept 2014) (MCDAO admonished for late Brady disclosure);

m. *People v. Handy*, 20 N.Y.3d 663 (2013) (ADA's failure to preserve video of incident found to be a *Brady* violation);

n. *People v. Gayden*, 111 A.D.3d 1388, 1389–90 (4th Dept. 2013) (failure to disclose the status of an essential prosecution witness as a paid informant constituted a *Brady* violation);

o. *People v. Bradley*, 20 N.Y.3d 128 (2012) (presentation of prejudicial and misleading evidence denied defendant a fair trial);

p. *People* v. *Fisher*, 18 N.Y.3d 964 (2012) (summation misconduct denied defendant a fair trial);

q. *People v. Santiago*, 101 A.D.3d 1715 (4th Dept 2012) (admonished prosecutor for summation misconduct);

r. *People v. Zacher*, 97 A.D.3d 1101 (4th Dept 2012) (holding that prosecutor's misconduct in characterizing the defendant's silence as evidence of his consciousness of guilt was harmless);

s. *People v. Presha*, 83 A.D.3d 1406 (4th Dept 2011) (improper summation and prejudicial remarks by the prosecutor denied the defendant a fair trial);

31

t. *People v. Stubbs*, 78 A.D.3d 1665 (4th Dept 2010) (the People's introduction of evidence of prior crimes to establish the defendant's identity was improper and denied defendant a fair trial);

u. *People v. Bell*, 66 A.D.3d 1478 (4th Dept 2009) (error in allowing the prosecutor to vouch for witnesses' credibility was harmless);

v. *People v. Davis*, 52 A.D.3d 1205 (4th Dept 2008) (late disclosure of key evidence denied the defendant a fair trial);

w. *People v. Harris*, 35 A.D.3d 1197 (4th Dept 2006) (*Brady* violation denied the defendant a fair trial);

x. *People v. Castro*, 784 N.Y.S.2d 466 (4th Dept 2004) (admonishing prosecutor for serious misconduct during summation);

y. *People v. Valentin*, 1 A.D.3d 982, 982–83 (4th Dept 2003) (*Brady* violation denied the defendant a fair trial);

z. *People v. Burke*, 566 N.Y.S.2d 169 (4th Dept 1991) (summation misconduct and the prosecutor's "pervasive pattern of misconduct" throughout the trial deprived defendant of fair trial);

aa. *People v. Grice*, 100 A.D.2d 419 (4th Dept 1984) (trial permeated by prosecutorial misconduct);

bb. *People v. Mott*, 94 A.D.2d 415 (4th Dept 1983) (deliberate and pervasive pattern of prosecutorial misconduct deprived the defendant of fair trial);

cc. *People v. Ausserau*, 77 A.D.2d 152, 154–55 (4th Dept 1980) (*Brady* violation).

dd. *Tyson v. State of New York,* 182 Misc.2d 707, 698 N.Y.S.2d 410 (Ct. Cl. 1999) (wrongful conviction litigation decision after 440.10 court in 1998 found police and

32

prosecutors committed Brady violation by failure to disclose exculpatory material and vacated defendant's 1973 murder conviction); see also *Tyson v. City of Rochester*, 1998 WL 101968 (prefiling $1.25 million settlement for witness intimidation, fabrication of witness statements, and concealment of exculpatory evidence).

ee. *US v. Mahoney et al,* CR 79-00065, (W.D.N.Y. 1979) (police officers and prosecutors suborned perjury, fabricated evidence, introduced false evidence in sixteen separate prosecutions).

119. Additionally, the D.A.'s Office was aware of numerous other instances of prosecutorial misconduct, including presentation of false testimony of prosecution witnesses, leading to prosecutions being thrown out.

120.  For example, in *People* v. *Fields*, Indictment No. 2009-0864 (Feb. 17, 2010), the Court granted the defendant's motion to suppress because it found the prosecution had presented false testimony of RPD Officer Mario Masic at the grand jury, where he testified that he observed the defendant from 30 feet away possessing a thumbnail bag of "crack", in an attempt to nullify constitutional deficiencies in his arrest paperwork and justify the initial unlawful stop and search of the defendant.  Moreover, in the two cases already discussed above, Jorge Dejesus Jr. and Ronnie Edmonds, it has been established that the MONROE COUNTY DISTRICT ATTORNEY OFFICE committed Brady violations.

121.  In *US v. Mahoney et al*, CR-79-00065, the jury found Patrick Brophy, an assistant district attorney in the Monroe County DA, guilty of violating the constitutional rights of Lawrence J. Masters by suborning perjury, fabricating evidence, introducing false testimony, and suppressing favorable evidence during a 1975 robbery prosecution. The same jury found William

C. Mahoney, Monroe County Sheriff chief of detectives and 21 year Rochester City police department veteran and former head of the Rochester Physical Crimes bureau, guilty of felony conspiracy to violate the civil rights of 16 different defendants through witness intimidation, fabricated witness statements, and false testimony. Federal prosecutors indicted and tried then-Monroe County assistant district attorney Raymond E. Cornelius – later a judge who presided over the trial in this matter  - for his part in the same conspiracy, but could not convince the jury that Cornelius was guilty beyond a reasonable doubt.[4]

122.  In *Tyson*, Betty Tyson, the longest then-serving woman prisoner in New York, won the reversal of her 1973 murder conviction in 1998 after witnesses Jon Jackson and Wayne Wright repudiated their trial testimony and further  testified in her 440.10 evidentiary hearing  that Rochester police officers, including then- RPD Physical Crimes bureau Detective William Mahoney threatened them with murder charges unless they made false statements identifying Tyson.  At trial, Tyson had testified that the statements used against her by then-Monroe County ADA Raymond Cornelius had been extracted after a post-arrest beating by RPD Detective Mahoney, which was corroborated in 1998 by Monroe County jail counselors who testified that Tyson bore bruises when she arrived at the Monroe County jail. Facing these facts, the City of Rochester paid Tyson $1.25 million dollars before she even filed suit. (see *Tyson v. City of Rochester,* 1998 WL 1019698**).**[5]

---

[4] See "Mahoney, Brophy convicted; Cornelius, Robortella cleared" "December 22, 1980 (Page 1 of 50)." *Democrat and Chronicle (1884-),* Dec 22 1980, p. 1. *ProQuest.* Web. 7 Feb. 2025 .

[5] Tyson's progress to exoneration was extensively reported in the Rochester *Democrat and Chronicle,* climaxing with "Judge Rules Cops Illegally Withheld Key Evidence" on page 1 of *,* May 22 1998 edition. "May 22, 1998 (Page 1 of 60)." *Democrat and Chronicle (1884-),* May 22 1998, p. 1. *ProQuest.* Web. 7 Feb. 2025 .

123. Finally, as discussed above, D.A. Relin fired A.D.A. Louis Pilato and Melinda Frank in retaliation for exposing a Brady violation in the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE during the time of RHYNES' prosecution, rather than disciplining the Assistant District Attorney, upon information and belief SIRAGUSA, for the misconduct.

124. Despite knowledge of such unlawful *de facto* policies and practices, the supervisory and policy-making officials of the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE and the COUNTY OF MONROE and their predecessors in interest did not take steps to terminate these policies and practices, did not discipline individuals who engage in such practices, or otherwise properly train prosecutors with regard to the constitutional and statutory limits on the exercise of their authority, and instead supported and ratified these policies, customs and practices through their deliberate indifference to or reckless disregard of the effect of said policies, customs and practices upon the constitutional rights of persons in the County of Monroe.

125. Additionally, after RHYNES' wrongful conviction, the D.A.'s Office failed to remedy its unlawful policy of refusing to discipline or sanction trial prosecutors whose misconduct caused convictions to be overturned.

**THE UNCONSTITUTIONAL ACTIONS OF DISTRICT ATTORNEY RELIN**

126. All of the acts by D.A. Relin and the other prosecutors described in the preceding paragraphs were carried out with the actual or constructive knowledge, consent, acquiescence, ratification and/or cooperation of the decision makers including highest ranking members of the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE as well as D.A. Relin.

127. Upon information and belief, D.A. Relin and his most senior management held regular meetings attended by supervisors and chiefs to review facts relating to investigations, to

35

authorize prosecutions and to discuss the status and progress of cases brought by that office, especially high profile cases like that of RHYNES, where he was charged with shooting at two men in a botched daylight robbery.

128. Upon information and belief, at meetings concerning the prosecution of RHYNES, Relin and his most senior management were briefed as to the status of the case and determinations were made to authorize the continuing prosecution of RHYNES after they were made aware of Smith's and Timmons' false testimony.

129. Upon information and belief, at these meetings, D.A. Relin and his most senior management were made well aware that both Smith's and Timmons' accounts were concocted and had been coached and/or coerced by employees of his office.

130. Nonetheless, D.A. Relin, either directly or by designating his authority and responsibilities to others in a senior management or supervisory capacity, failed to adequately supervise ADA STODDART, GARNER and SIRAGUSA and/or JOHN/JANE DOES 1-10 and allowed the prosecution of RHYNES to continue despite being informed of the inadequacy of the evidence.

131. Despite his knowledge of the impropriety of prosecution, D.A. Relin did not terminate this prosecution, did not discipline prosecutors who engaged in unconstitutional and unlawful practices, and did not properly train or supervise these prosecutors with regard to the constitutional and statutory limits on the exercise of their authority, and instead acquiesced and ratified the unconstitutional and unlawful practices in this case through his callous, reckless and/or deliberate indifference to the effect of said practices upon the constitutional rights of persons in the County of Monroe and the plaintiff herein.

132. Without limiting the foregoing, D.A. Relin has specifically omitted to take the following steps to terminate the unconstitutional and unlawful practices:

133. Relin has failed to properly supervise, train, instruct, and discipline prosecutors who withhold exculpatory evidence and/or impeachment materials, in violation of *Brady*, *Giglio* and their progeny;

134. Relin has failed to discipline prosecutors who obtained convictions that were overturned on appeal due to prosecutorial misconduct;

135. Relin has failed to discipline prosecutors who obtained conviction that, while not overturned on appeal, were admonished by the appellate division for having committed misconduct;

136. Relin has failed to convene an Ethics Review Panel to investigate the conduct of prosecutors accused of misconduct by attorneys, courts, and the public—in direct violation of the purported written policies of the D.A.'s Office;

137. Relin has failed to properly supervise, train, instruct, and discipline prosecutors who present false or misleading argument, evidence and testimony at trial;

138. Relin has failed to properly supervise, train, instruct, and discipline prosecutors with regard to witnesses who recant prior statements made to the police.

139. The Defendants MONROE COUNTRY DISTRICT ATTORNEY'S OFFICE and MONROE COUNTY are directly liable and responsible for the acts of D.A. Relin because of the repeated and knowing failure to properly supervise, train and discipline prosecutors and because of the repeated and knowing failure to enforce the professional and ethical obligations of

prosecutors, and to require their compliance with the Constitutions and laws of the State of New York and the United States, and with her offices' own rules, policies and guidelines.

140. The knowing and repeated failure of D.A. Relin to properly supervise, train and discipline the prosecutors in his Office actually caused the injuries to RHYNES alleged herein.

141. Defendant COUNTY OF MONROE knew or should have known that the acts and failures to act of D.A. Relin alleged herein would deprive Plaintiff of his rights, in violation of the Fourth, Fifth, Sixth, Ninth, Thirteenth and Fourteenth Amendments to the United States Constitution and Article 1, §§ 1, 6, 11, and 12 of the Constitution of the State of New York, including, without limitation, RHYNES' freedom from prosecution in the absence of probable cause and deprivation of liberty without due process of law.

**AS AND FOR A FIRST CAUSE OF ACTION: 42 U.S.C. § 1983 (DEFENDANTS TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO,  SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10):**

142. The allegations in paragraphs 1 through 139 of the complaint are repeated and re-alleged as if fully set forth herein.

143. Defendants TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO,  SEXTONE, and/or JOHN/JANE DOE NOS. 1 through 10 in the employ of the ROCHESTER POLICE DEPARTMENT deprived plaintiff RHYNES of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States by manner and means including but not limited to the following:

   a.  JACKSON, ROTUNNO, TROTTO, and BARNES fabricated the alleged identification of plaintiff RHYNES by Ali Hasan by unlawfully threatening, intimidating, coercing, coaching and/or suggesting that Hasan identify plaintiff as the planner of the robbery;

b. TROTTO, ROTUNNO, and PRESCOTT fabricated the alleged identification of RHYNES by Vernessa Maddox and Anne Maddox by unlawfully threatening, intimidating, coercing, coaching and/or suggesting that the Maddox sisters identify plaintiff as a participant in the Rico's bar robbery and murders;

c. Unknown JOHN/JANE DOE RPD OFFICERS Fabricated the alleged admissions by RHYNES by Joe Smith and/or Roy Timmons by unlawfully threatening, intimidating, coercing, coaching, feeding details and/or suggesting that Mr. Smith and Mr. Timmons state the RHYNES admitted his role of a shooter and/or implicated himself in the Rico's Bar robbery and murders;

d. BORRIELLO and BARNES fabricated the alleged identification of RHYNES by Cleavon Clark by unlawfully threatening, intimidating, coercing, coaching and/or suggesting that Mr. Clark identify plaintiff as planning the Rico's Bar Robbery;

e. BORRIELLO fabricated the alleged identification of RHYNES by Thurmond Dicker by unlawfully threatening, intimidating, coercing, coaching and/or suggesting that Mr. Dicker identify plaintiff as a participant in the Rico's Bar robbery and murders;

f. TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10 induced, suborned, coerced and/or allowed Ali Hasan, Vernessa Maddox, and Anne Maddox to perjure themselves at the grand jury and during RHYNES' trial;

g. Unknown JOHN/JANE DOES RPD OFFICERS Induced, suborned, coerced and/or allowed Joe Smith and/or Roy Timmons to perjure themselves at RHYNES' trial;

39

h. JACKSON perjuriously testified about his interaction with Ali Hasan and Anne Maddox, including but not limited to that both volunteered knowledge of the robbery and information implicating plaintiff free of coercion and/or coaching;

i. ROTUNNO perjuriously testified that Vernessa Maddox gave a statement and identified RHYNES free of coercion and/or coaching;

j. TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10 failed to disclose exculpatory material, including but not limited to the fact Hasan falsely identified RHYNES under coercion and threats by R.P.D. Officers less than two days after the botched robbery to the defense; and that Hasan was in fact under federal sentence for conspiracy to distribute of counterfeit United States currency in the United States District Court in the Western District of New York, the prior convictions and arrests of Ann Maddox, that witnesses had been unlawfully coerced and/or coached, and that there had been multiple suspects other than Plaintiff before his arrest.;

k. TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10 failed to investigate, obtain and/or follow up on exculpatory evidence of which they knew or should have known, including to multiple other suspects, and which would have proven Plaintiff's total innocence.

l. TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10 failed to intervene and stop the aforementioned unconstitutional violations from occurring, which as law enforcement officers, each and every defendant had an affirmative duty to intervene to prevent.

144.   The specific acts of each defendant by which they effected these deprivations are set forth above in the Statement of Facts, which is incorporated by reference herein and is common to all causes of action

145.   In effecting each of the above deprivations, defendants TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10 acted under color of New York State law.

146.   In effecting each of the above deprivations, TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH were deliberately indifferent to the constitutional rights of the Plaintiff.

147.   Because the plaintiff's arrest and conviction was obtained through fraud, perjury, coercion and/or the willful failure to investigate exculpatory evidence, there was no probable cause to arrest, prosecute and convict the plaintiff.

148.   Because the plaintiff's conviction was obtained through fraud, perjury, coercion, failure to disclose exculpatory evidence and/or the willful failure to investigate exculpatory evidence, any probable cause that may arguably have existed at the time of the arrest was vitiated by the time of indictment, trial and/or conviction.

149.   Because the plaintiff's arrest and conviction was obtained through fraud, perjury, coercion, failure to disclose exculpatory evidence and/or the willful failure to investigate exculpatory evidence, no presumption of regularity attaches to any act of the Defendants.

150.   Thus, defendants TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10's actions constituted malicious prosecution, deprivation of liberty without due process of law, denial of the right to a

41

fair trial and/ failure to intervene in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

151. Plaintiff's injuries were proximately caused by the aforesaid constitutional deprivations and conduct of the Defendants.

152. By reason of the foregoing, defendants TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10 are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for damages in an amount to be determined at trial.

**AS AND FOR A SECOND CAUSE OF ACTION: 42 U.S.C. § 1983 (1ST MONELL CLAIM)(DEFENDANTS CITY OF ROCHESTER AND ROCHESTER CITY POLICE DEPARTMENT):**

153. The allegations in paragraphs 1 through 150 of the complaint are repeated and re-alleged as if fully set forth herein.

154. The aforesaid constitutional violations were proximately caused by one or more policies, practices and/or customs of defendants CITY OF ROCHESTER and/or ROCHESTER CITY POLICE DEPARTMENT, including but not limited to fabricating false identifications either through unlawful coaching, suggestion, threats and/or coercion; fabricating evidence; perjury; intimidation of defense witnesses; failure to investigate exculpatory evidence; and failing to disclose exculpatory material.

155. It was further the policy, practice and/or custom of defendant CITY OF ROCHESTER and/or ROCHESTER CITY POLICE DEPARTMENT to fail to train, discipline and/or supervise police officers so as to prevent them from fabricating false identifications either through unlawful coaching, suggestion, or coercion, fabricating evidence, perjuring themselves at

trial, relying on witnesses known to be untruthful, failing to investigate exculpatory evidence, and failing to disclose exculpatory material.

156. The CITY OF ROCHESTER and/or ROCHESTER CITY POLICE DEPARTMENT knew to a moral certainty that its police officers would confront situations conducive to fabricating false identifications either through unlawful coaching, suggestion, or coercion suggestive identification procedures, fabrication of evidence, perjury, reliance on witnesses known to be untruthful, failure to investigate exculpatory evidence and/or failure to disclose exculpatory material.

157. The CITY OF ROCHESTER and/or ROCHESTER CITY POLICE DEPARTMENT knew that such situations would lead to difficult choices of the type that training, supervision and/or discipline would help to resolve.

158. The CITY OF ROCHESTER and/or ROCHESTER CITY POLICE DEPARTMENT knew that, in the event of an incorrect choice, a constitutional deprivation was highly likely to occur.

159. There are many facts and circumstances from which these policies, patterns, practices and/or customs may be inferred.

160. Between May 22, 1972 and November 14, 1973, LEONARD BORRIELLO, then a narcotics detective in the Rochester Police Department, was suspended and came under federal indictment and subsequent trial accused of involvement in a scheme to steal heroin, cocaine, and marijuana from the narcotics squad evidence locker, selling the evidence to known Rochester-area drug dealers, and extorting Rochester-area drug dealers going as far back as May 1970.

161. According to evidence presented at two trials in 1973, beginning in 1970, BORRIELLO, a colleague Scott Shales, and his superior, Nelson T. Evans (later convicted) exploited their access to the Narcotics squad evidence locker to sign out impounded drugs, including heroin, cocaine, and marijuana, which were substituted for diluted, cut, or even inert fakes and falsely recorded as being returned. Seven witnesses testified against BORRIELLO, that BORRIELLO had given heroin and other drugs to cooperating informants, including to an underage witness, Susan Jean Sprague. (see "Witnesses link 11 Police to Local Crimes" Rochester Democrat & Chronicle 1B, April 12, 1973)

162. In fact, one of the police officers who tried, Albert Joseph, was indicted along with Leonard BORRIELLO even though he had been the police officer who alerted his supervisors to the missing contraband.  Joseph testified under closed doors on September 25 and 26, 1973 that BARNES admitted to him having had a drunken conversation with BORRIELLO in which BORRIELLO confided to BARNES that he knew of the contraband thefts. Joseph, who had reported the matter to his supervisor John J Gerbino who had said to him that his "tip would lead to a big investigation," and that "if a police officer is selling heroin, he should go to jail." Joseph remained silent about his role as informant even in the federal grand jury, because he feared for the safety of his family.  (See "Doors Closed" RD&C September 27, 1973 1B, "Officer says Tip Lead to Police Probe" RD&C November 17, 1973 10B).

163. In fact, CHARLES SCHAFER, the Monroe County Investigator who unconstitutionally coached an coerced key witnesses in thjs case, who had been a Rochester City Police Officer, also testified on March 27, 1973 that:

> Aren't there many in- stances in which people aren't arrested because the police want to use them as inform- ants or witnesses later?" Napier asked him. "Yes, sir, there are," Schafer replied. "And haven't you, yourself, at times given informants money to get

44

information?" Napier asked Schafer admitted he had. "That's all," Napier said. Schafer was testifying about a stolen television set he got from Pedro Cruz-Arc- e Dec. 30, 1971. He said he went to Arce's Gilmore Street house and picked up the set. Arce told him that he had given another set to Evans, Schafer said. Evans called him that same night and told him he had the set and made arrangements to turn it over, Schafer said. Schafer said he later picked up the set at Evan's home. "Did you arrest Arce for possession of stolen property?" Napier asked him. Schafer said he hadn't because of Arce's cooperation and his possible use as a witness against the thief. He said Arce had helped him before in a burglary investigation. ("Gave Officer $7000, Drug Seller Testifies" RDC March 28, 1973 1B-2B.)

164.  Officer Mayer's manipulative tactics were remarked upon even prior to plaintiff RHYNES's dismissal. Mayer was a high-profile detective in Rochester during the 1980s and was considered a hero or "rock star" within the department. At Mayer's 1989 retirement, Capt. Lynde Johnston said "[Mayer] feels that the arrest of a person is no good unless you get a conviction. He would feel like he let a victim's family down if he didn't get one", said Lynde in the May 6, 1989 Rochester Democrat and Chronicle.

165.  It may be inferred from this these facts and statements that police misconduct was well known within the department and that superiors tolerated, acquiesced in and even encouraged them so long as they got results. The fact that a significant number of Rochester police officers and detectives, who were involved in Plaintiff's conviction, felt free to act in a similar manner both before and during this period supports a clear inference that such tactics were considered normal, acceptable and to be encouraged within the ROCHESTER CITY POLICE DEPARTMENT, and thus rose to the level of a pattern, practice and/or custom.

166. Further, the unconstitutional policies, patterns, practices and/or customs of the City, as stated above, may be inferred from the following cases in which constitutional violations similar to those in the instant case occurred:

a.    *People v. Ausserau*, 77 A.D.2d 152, 154–55 (4th Dept 1980) (*Brady* violation demonstrated police officer testified falsely at trial).

b.    *People v. Owens*, 159 A.D.3d 1349 (4th dept. 2018) (video evidence directly relevant to show that sole eyewitness fabricated her story).

c.    *People v. Miller*, 191 A.D.3d 111 (4th Dept. 2020) (conviction reversed on weight of the evidence where there was "considerable objective evidence of defendant's innocence" and where initial police stop was based purely on race)

d.    *Tyson v. State of New York,* 182 Misc.2d 707, 698 N.Y.S.2d 410 (Ct. Cl. 1999) (wrongful conviction litigation decision after 440.10 court in 1998 found police and prosecutors committed Brady violation by failure to disclose exculpatory material and vacated defendant's 1973 murder conviction); see also *Tyson v. City of Rochester*, 1998 WL 101968 (prefiling $1.25 million settlement for witness intimidation, fabrication of witness statements, and concealment of exculpatory evidence).

e.    *US v. Mahoney et al,* CR 79-00065, (W.D.N.Y. 1979) (police officers and prosecutors suborned perjury, fabricated evidence, introduced false evidence in sixteen separate prosecutions).

167.  In *US v. Mahoney et al*, CR-79-00065, the jury found Patrick Brophy, an assistant district attorney in the Monroe County DA, guilty of violating the constitutional rights of Lawrence J. Masters by suborning perjury, fabricating evidence, introducing false testimony, and suppressing favorable evidence during a 1975 robbery prosecution. The same jury found William C. Mahoney, Monroe County Sheriff chief of detectives and 21 year Rochester City police department veteran and former head of the Rochester Physical Crimes bureau, guilty of felony conspiracy to violate the civil rights of 16 different defendants through witness intimidation,

fabricated witness statements, and false testimony. Federal prosecutors indicted and tried then-Monroe County assistant district attorney Raymond E. Cornelius – later a judge who presided over the trial in this matter - for his part in the same conspiracy, but could not convince the jury that Cornelius was guilty beyond a reasonable doubt.[6]

168.  In *Tyson*, Betty Tyson, the longest then-serving woman prisoner in New York, won the reversal of her 1973 murder conviction in 1998 after witnesses Jon Jackson and Wayne Wright repudiated their trial testimony and further testified in her 440.10 evidentiary hearing  that Rochester police officers, including then- RPD Physical Crimes bureau Detective William Mahoney threatened them with murder charges unless they made false statements identifying Tyson.  At trial, Tyson had testified that the statements used against her by then-Monroe County ADA Raymond Cornelius had been extracted after a post-arrest beating by RPD Detective Mahoney, which was corroborated in 1998 by Monroe County jail counselors who testified that Tyson bore bruises when she arrived at the Monroe County jail. Facing these facts, the City of Rochester paid Tyson $1.25 million dollars before she even filed suit. (see Tyson v. City of Rochester, 1998 WL 1019698).[7]

169.  It should be noted that the above noted misconduct, which are based on reported decisions, trials, and police statements in newspaper articles, are only the tip of the iceberg, and that each represents dozens or even hundreds of other cases in which misconduct was not detected

---

[6] See "Mahoney, Brophy convicted; Cornelius, Robortella cleared" "December 22, 1980 (Page 1 of 50)." *Democrat and Chronicle (1884-),* Dec 22 1980, p. 1. *ProQuest.* Web. 7 Feb. 2025 .

[7] Tyson's progress to exoneration was extensively reported in the Rochester  *Democrat and Chronicle,* climaxing with "Judge Rules Cops Illegally Withheld Key Evidence" on page 1 of , May 22 1998 edition. "May 22, 1998 (Page 1 of 60)." *Democrat and Chronicle (1884-),* May 22 1998, p. 1. *ProQuest.* Web. 7 Feb. 2025 .

or in which it was detected but did not lead to a reported decision (due, for instance, to an acquittal or dismissal).

170. For example, in *People v. Fields*, Indictment No. 2009-0864 (Feb. 17, 2010), the Court granted the defendant's motion to suppress because it found the prosecution had presented false testimony of RPD Officer Mario Masic at the grand jury, where he testified that he observed the defendant from 30 feet away possessing a thumbnail bag of "crack", in an attempt to nullify constitutional deficiencies in his arrest paperwork and justify the initial unlawful stop and search of the defendant.

171. Upon information and belief, ample other evidence of the above-stated unconstitutional patterns, practices, policies and/or customs exists, which is within the sole and exclusive knowledge of the defendants herein and which may be obtained through discovery.

172. By reason of the foregoing, defendants CITY OF ROCHESTER and ROCHESTER CITY POLICE DEPARTMENT are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for damages in an amount to be determined at trial.

**AS AND FOR A THIRD CAUSE OF ACTION: 42 U.S.C. § 1983 (DEFENDANTS SCHAFER, STODDART, GARNER, SIRAGUSA, AND JOHN/JANE DOE NOS. 1 THROUGH 10):**

173. The allegations in paragraphs 1 through 170 of the complaint are repeated and re-alleged as if fully set forth herein.

174. D.A. Relin and defendants SCHAFER, STODDART, GARNER, SIRAGUSA and JOHN/JANE DOE NOS. 1 through 10 deprived plaintiff RHYNES of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States by manner and means including but not limited to the following:

a.    SCHAFER, STODDART, SIRAGUSA, and/or JOHN/JANE DOE NOS. 1 through 10 fabricated the alleged admissions by plaintiff RHYNES by Joe Smith and Roy Timmons by unlawfully threatening, intimidating, coercing, coaching, feeding details and/or suggesting that Mr. Smith and Mr. Timmons state the RHYNES admitted his role of a shooter and/or implicated himself in the Rico's Bar robbery and murders;

b.    SCHAFER, STODDART, GARNER, and/or JOHN/JANE DOE NOS. 1 through 10 fabricated the alleged identification of plaintiff RHYNES by Vernessa Maddox and Anne Maddox by unlawfully threatening, intimidating, coercing, coaching and/or suggesting that they identify plaintiff as a participant in the Rico's Bar robbery and murders;

c.    SCHAFER, STODDART, GARNER, SIRAGUSA and/or JOHN/JANE DOE NOS. 1 through 10 induced, suborned, coerced and/or allowed Ali Hasan, Vernessa Maddox, Anne Maddox, JULIAN JACKSON, LOUIS ROTUNNO and others to perjure themselves at the grand jury and during the plaintiff's trial;

d.    SCHAFER, STODDART, SIRAGUSA and/or JOHN/JANE DOE NOS. 1 through 10 induced, suborned, coercing and/or allowing Joe Smith and Roy Timmons to perjure themselves at the plaintiff's trial;

e.    SCHAFER, STODDART, GARNER, and/or JOHN/JANE DOE NOS. 1 through 10 Fabricating the alleged identification of plaintiff RHYNES by Cleavon Clark by unlawfully threatening, intimidating, coercing, coaching and/or suggesting that Mr. Clark identify plaintiff as planning the Rico's Bar Robbery;

f.    SCHAFER, STODDART, GARNER, SIRAGUSA and/or JOHN/JANE DOE NOS. 1 through 10 fabricated the alleged identification of plaintiff RHYNES by Thurmond Dicker by

49

unlawfully threatening, intimidating, coercing, coaching and/or suggesting that Mr. Dicker identify plaintiff as a participant in the Rico's Bar robbery and murders.

g.    SCHAFER, STODDART, GARNER, SIRAGUSA and/or JOHN/JANE DOE NOS. 1 through 10 failed to disclose *Brady and other* exculpatory material, including the criminal felony convictions of Annie Jean Maddox and Ali Hassan for crimes of dishonesty, and the fact that witnesses had been unlawfully coerced and/or coached, and that there had been multiple suspects other than Plaintiff before his arrest.;

h.    SCHAFER, STODDART, GARNER, SIRAGUSA and JOHN/JANE DOE NOS. 1 through 10 failed to investigate, obtain and/or follow up on exculpatory evidence of which they knew or should have known, including but not limited to multiple other suspects, and which would have proven Plaintiff's total innocence.

i.    SCHAFER, STODDART, GARNER, SIRAGUSA and JOHN/JANE DOE NOS. 1 through 10 failed to intervene and stop the aforementioned unconstitutional violations from occurring, which as law enforcement officers, each and every defendant had an affirmative duty to intervene to prevent.

175.    The specific acts of each defendant by which they effected these deprivations are set forth above in the Statement of Facts, which is incorporated by reference herein and is common to all causes of action.

176.    In effecting each of the above deprivations, defendants SCHAFER, STODDART, GARNER, SIRAGUSA and JOHN/JANE DOE NOS. 1 through 10 acted under color of New York State law.

50

177.  In effecting each of the above deprivations, defendants SCHAFER, STODDART, GARNER, SIRAGUSA and JOHN/JANE DOE NOS. 1 through 10 were deliberately indifferent to the constitutional rights of the Plaintiff.

178.  Because the plaintiff's arrest and conviction was obtained through fraud, perjury, coercion and/or the willful failure to investigate exculpatory evidence, there was no probable cause to arrest, prosecute and convict the plaintiff.

179.  Because the plaintiff's conviction was obtained through fraud, perjury, coercion, failure to disclose exculpatory evidence and/or the willful failure to investigate exculpatory evidence, any probable cause that may arguably have existed at the time of the arrest was vitiated by the time of indictment, trial and/or conviction.

180.  Because the plaintiff's arrest and conviction was obtained through fraud, perjury, coercion, failure to disclose exculpatory evidence and/or the willful failure to investigate exculpatory evidence, no presumption of regularity attaches to any act of the Defendants.

181. Thus, defendants SCHAFER, STODDART, GARNER, SIRAGUSA and JOHN/JANE DOE NOS. 1 through 10's actions constituted malicious prosecution, deprivation of liberty without due process of law, denial of the right to a fair trial and/or failure to intervene in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

182. Plaintiff's injuries were proximately caused by the aforesaid constitutional deprivations and conduct of the Defendants.

183. By reason of the foregoing, defendants SCHAFER, STODDART, GARNER, SIRAGUSA and JOHN/JANE DOE NOS. 1 through 10 are liable to Plaintiff pursuant to 42 U.S.C.

51

§ 1983 for both compensatory and punitive damages that they identify in an amount to be determined at trial.

**AS AND FOR A FOURTH CAUSE OF ACTION: 42 U.S.C. § 1983 (2ND MONELL CLAIM) (DEFENDANTS MONROE COUNTY AND MONROE COUNTY DISTRICT ATTORNEY):**

184. The allegations in paragraphs 1 through 181 of the complaint are repeated and re-alleged as if fully set forth herein.

185. The aforesaid constitutional violations were proximately caused by one or more policies, practices and/or customs of defendants MONROE COUNTY and/or MONROE COUNTY DISTRICT ATTORNEY, including but not limited to fabricating false identifications either through unlawful coaching, suggestion, threats and/or coercion; fabricating evidence; presenting perjured and fabricated evidence and testimony; intimidation of defense witnesses; failure to investigate exculpatory evidence; and failing to disclose exculpatory material.

186. It was further the policy, practice and/or custom of defendants MONROE COUNTY and/or MONROE COUNTY DISTRICT ATTORNEY to fail to train, discipline and/or supervise prosecutors, their investigators and other employees so as to prevent them from fabricating false identifications either through unlawful coaching, suggestion, or coercion, fabricating evidence, presenting fabricated and/or perjured testimony and evidence at trial, relying on witnesses known to be untruthful, failing to investigate exculpatory evidence, and failing to disclose exculpatory material

187. The MONROE COUNTY and/or MONROE COUNTY DISTRICT ATTORNEY knew to a moral certainty that its prosecutors, investigators, and other employees would confront situations conducive to fabricating false identifications either through unlawful

coaching, suggestion, or coercion, suggestive identification procedures, fabrication of evidence, perjury, presentation of fabricated or perjured testimony or other evidence, reliance on witnesses known to be untruthful, failure to investigate exculpatory evidence and/or failure to disclose exculpatory material.

188. The MONROE COUNTY and/or MONROE COUNTY DISTRICT ATTORNEY knew that such situations would lead to difficult choices of the type that training, supervision and/or discipline would help to resolve.

189. MONROE COUNTY and/or MONROE COUNTY DISTRICT ATTORNEY knew that, in the event of an incorrect choice, a constitutional deprivation was highly likely to occur.

190. There are many facts and circumstances from which these policies, patterns, practices and/or customs may be inferred. To begin with, as presented above, between 1980 and before Plaintiff's indictment was finally dismissed, there were numerous appellate and trial court decisions that alerted the final policy makers the prosecution misconduct in withholding evidence favorable to defense and/or presentation of misleading arguments and false evidence at trial deprived defendants of their contitutional rights and a fair trial. However, no trial prosecutor employed by the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE has been disciplined after a court finding that a prosecutor engaged in prosecutorial misconduct. Moreover, up until recently, MONROE COUNTY DISTRICT ATTORNEY'S OFFICE has failed to maintain even a system concerning the supervision, oversight and disciplining of prosecutors in its office.

191. The fact that a significant number of Monroe County prosecutors felt free to act in a similar manner to defendants in this case during this period, and the fact that they were not

disciplined or that there was a failure to train to do otherwise, supports a clear inference that such tactics were considered normal, acceptable and to be encouraged within the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE and MONROE COUNTY and thus rose to the level of a pattern, practice and/or custom.

192. The existence of unconstitutional policies, patterns, practices and/or customs within the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE and MONROE COUNTY can be further inferred by the fact that D.A. Relin fired A.D.A. Louis Pilato and Melinda Frank in retaliation for exposing a Brady violation in the MONROE COUNTY DISTRICT ATTORNEY'S OFFICE during the time of RHYNES prosecution. The fact that the whistleblowers of the misconduct were fired, rather than the assistant district attorney responsible for the misconduct being disciplined, further supports the inference that this type of misconduct constituted official policy, pattern and practice of the MONROE COUNTY DISTRICT ATTORNEY and MONROE COUNTY.

193. Therefore in addition to the widespread practice of prosecutorial misconduct alleged above, MONROE COUNTY AND THE MONROE COUNTY DISTRICT ATTORNEY'S OFFICE failed to discipline its employees for such misconduct and/or were deliberately indifferent to it.

194. It should be noted that the above, which are based on reported decisions, are only the tip of the iceberg, and that each represents dozens or even hundreds of other cases in which misconduct was not detected or in which it was detected but did not lead to a reported decision (due, for instance, to an acquittal or dismissal).

195. Upon information and belief, ample other evidence of the above-stated unconstitutional patterns, practices, policies and/or customs exists, which is within the sole and exclusive knowledge of the defendants herein and which may be obtained through discovery.

196. By reason of the foregoing, defendants MONROE COUNTY AND MONROE COUNTY DISTRICT ATTORNEY are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for both compensatory and punitive damages in an amount to be determined at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION: 42 U.S.C. § 1983  CIVIL RIGHTS CONSPIRACY (DEFENDANTS SCHAFER, STODDART, GARNER, SIRAGUSA, TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10):**

197. The allegations in paragraphs 1 through 193 of the complaint are repeated and re-alleged as if fully set forth herein.

198. Defendants, acting within the scope of their employment and under color of state law, agreed among themselves in order to deprive Plaintiff of his clearly established constitutional right to due process of law and to a fair trial by coercing and/or coaching witnesses, presenting false testimony or evidence, and withholding material exculpatory and impeachment evidence, both to improperly convict defendant as part of a bad faith attempt to cover up their respective misconduct during Plaintiff's prosecution.

199. In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including without limitation the following: Fabricating the alleged identification and admissions of plaintiff RHYNES by unlawfully threatening, intimidating, coercing, coaching and/or suggesting witnesses identify or implicate plaintiff's involvement in the Rico's Bar robbery and murders; Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* evidence during the pendency of the case; Giving and/or

presenting perjurious trial at the grand jury, pre-trial hearings and trial of Plaintiff; Failure to investigate, obtain and/or follow up on exculpatory evidence of which they knew or should have known, including to multiple other suspects, and which would have proven Plaintiff's total innocence; Failure to intervene and stop the aforementioned unconstitutional violations from occurring, which as law enforcement officers, each and every defendant had an affirmative duty to intervene to prevent; Concealing their misconduct from fellow officers and prosecutors, supervisors, and the trial court, thereby causing the continued wrongful prosecution of Plaintiff.

200. The acts and omissions of the above named Defendants, were the direct and proximate cause of Plaintiff's injuries. By reason of the foregoing, defendants SCHAFER, STODDART, GARNER, SIRAGUSA, TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10 are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for damages in an amount to be determined at trial.

**AS AND FOR A SIXTH CAUSE OF ACTION: FALSE IMPRISONMENT (ALL INDIVIDUAL DEFENDANTS):**

201. The allegations in paragraphs 1 through 197 of the complaint are repeated and re-alleged as if fully set forth herein.

202. By reason of the foregoing, defendants and each of them are liable to Plaintiff for false imprisonment in an amount to be determined at trial.

**AS AND FOR A SEVENTH CAUSE OF ACTION: MALICIOUS PROSECUTION (ALL INDIVIDUAL DEFENDANTS):**

203. The allegations in paragraphs 1 through 199 of the complaint are repeated and re-alleged as if fully set forth herein.

204.  By reason of the foregoing, defendants and each of them are liable to Plaintiff for malicious prosecution in an amount to be determined at trial.

**AS AND FOR AN EIGHTH CAUSE OF ACTION: NEGLIGENCE (DEFENDANTS TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10):**

205.  The allegations in paragraphs 1 through 201 of the complaint are repeated and re-alleged as if fully set forth herein.

206. Defendants, their employees, agents and/or servants were careless, reckless and/or negligent in failing to investigate exculpatory evidence of which they knew or should have known; failing to implement policies, practices and/or procedures to ensure that unconstitutionally fabricated identifications would not occur; failing to implement policies, practices and/or procedures to ensure that evidence would not be fabricated against criminal defendants; failing to implement policies, practices and/or procedures to ensure that police officers would not perjure themselves at criminal trials; failing to implement policies, practices and/or procedures to ensure that exculpatory evidence would not be withheld; failing to implement policies, practices and/or procedures to ensure that defense witnesses would not be intimidated; failure to exercise proper oversight, supervision and/or control to ensure that police officers and investigators did not run roughshod over the civil rights of the people of the city; and in otherwise being careless, reckless and/or negligent.

207.  Plaintiff's injuries and each of them were proximately caused by the aforesaid carelessness, recklessness and/or negligence of the defendants.

208.  By reason of the foregoing, defendants and each of them are liable to Plaintiff for negligence in an amount to be determined at trial.

**AS AND FOR A NINTH CAUSE OF ACTION: NEGLIGENCE (DEFENDANTS SCHAFER, STODDART, GARNER, SIRAGUSA, AND JOHN/JANE DOE NOS. 1 THROUGH 10):**

209.  The allegations in paragraphs 1 through 205 of the complaint are repeated and re-alleged as if fully set forth herein.

210.  Defendants, their employees, agents and/or servants were careless, reckless and/or negligent in failing to investigate exculpatory evidence of which they knew or should have known; failing to implement policies, practices and/or procedures to ensure that unconstitutionally fabricated identifications and fabricated testimony of other evidence would not occur; failing to implement policies, practices and/or procedures to ensure that evidence would not be fabricated against criminal defendants; failing to implement policies, practices and/or procedures to ensure that witnesses would not perjure themselves at criminal trials; failing to implement policies, practices and/or procedures to ensure that exculpatory evidence would not be withheld; failing to implement policies, practices and/or procedures to ensure that defense witnesses would not be intimidated; failure to exercise proper oversight, supervision and/or control to ensure that prosecutors, investigators, or other employees did not run roughshod over the civil rights of the people of the city; and in otherwise being careless, reckless and/or negligent.

211.  Plaintiff's injuries and each of them were proximately caused by the aforesaid carelessness, recklessness and/or negligence of the defendants.

212.  By reason of the foregoing, defendants and each of them are liable to Plaintiff for negligence for both compensatory and punitive damages in an amount to be determined at trial.

**AS AND FOR AN TENTH CAUSE OF ACTION: NEGLIGENT HIRING, RETENTION AND/OR SUPERVISION (AGAINST DEFENDANTS CITY OF ROCHESTER AND ROCHESTER CITY POLICE DEPARTMENT):**

58

213. The allegations in paragraphs 1 through 209 of the complaint are repeated and re-alleged as if fully set forth herein.

214. Defendants CITY OF ROCHESTER and ROCHESTER CITY POLICE DEPARTMENT were on actual and constructive notice prior to plaintiff's arrest and trial that TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH were unfit to serve as law enforcement officers.

215. Nevertheless, defendants CITY OF ROCHESTER and ROCHESTER CITY POLICE DEPARTMENT hired, retained and promoted TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10 in law enforcement capacities in which they were unfit to serve.

216. Defendants CITY OF ROCHESTER and ROCHESTER CITY POLICE DEPARTMENT further failed to exercise adequate and reasonable supervision, oversight and/or control over defendants TROTTO, ROTUNNO, PRESCOTT, JACKSON, BARNES, BORIELLO, SEXTONE, and/or JOHN/JANE DOE NOS. 1 THROUGH 10, thus enabling them to pursue their unconstitutional practices and objectives.

217. Plaintiff's injuries and each of them were proximately caused by the conduct of defendants CITY OF ROCHESTER and ROCHESTER CITY POLICE DEPARTMENT as aforesaid.

218. By reason of the foregoing, defendants and each of them are liable to Plaintiff for negligent hiring, retention and/or supervision in an amount to be determined at trial.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION: NEGLIGENT HIRING, RETENTION AND/OR SUPERVISION (AGAINST DEFENDANTS MONROE COUNTY AND MONROE COUNTY DISTRICT ATTORNEY):**

219.  The allegations in paragraphs 1 through 215 of the complaint are repeated and re-alleged as if fully set forth herein.

220. Defendants MONROE COUNTY AND MONROE COUNTY DISTRICT ATTORNEY were on actual and constructive notice prior to plaintiff's arrest and trial that MONROE COUNTY ASSISTANT DISTRICT ATTORNEY DOUGLAS STODDART, ASSISTANT DISTRICT ATTORNEY MICHAEL GARNER, ASSISTANT DISTRICT ATTORNEY CHARLES SIRAGUSA, INVESTIGATOR CHARLES R. SCHAFER, AND JOHN/JANE DOE NOS. 1 THROUGH 10 were unfit to serve as prosecutors or investigators.

221.  Nevertheless, defendants MONROE COUNTY AND MONROE COUNTY DISTRICT ATTORNEY hired, retained and/or promoted STODDART, GARNER, SIRAGUSA, SCHAFER, and JOHN/JANE DOES 1-10 in positions in which they were unfit to serve.

222. Defendants MONROE COUNTY AND MONROE COUNTY DISTRICT ATTORNEY further failed to exercise adequate and reasonable supervision, oversight and/or control over defendants STODDART, GARNER, SIRAGUSA, SCHAFER, and JOHN/JANE DOES 1-10, thus enabling them to pursue their unconstitutional practices and objectives.

223.  Plaintiff's injuries and each of them were proximately caused by the conduct of defendants MONROE COUNTY AND MONROE COUNTY DISTRICT ATTORNEY as aforesaid.

224.  By reason of the foregoing, defendants and each of them are liable to Plaintiff for negligent hiring, retention and/or supervision in an amount to be determined at trial.

225.  **WHEREFORE and in light of the foregoing**, Plaintiff respectfully requests that the Court assume jurisdiction and:

226. Award appropriate compensatory damages of not less than $100 million;

227. Award appropriate punitive damages of not less than $100 million;

228. Award attorney's fees and costs pursuant to 42 U.S.C. § 1988 and the inherent powers of the Court;

229. Award pre-judgment interest as allowed by law;

230. Empanel a jury.

231. Plaintiff demands judgment against defendants jointly and severally in an amount to be determined at trial together with costs, disbursements, attorneys' fees and such other and further relief as this Court may deem just and proper.


Dated: New York, NY
       December 3, 2025

                                             Respectfully Submitted,


                                             /s/ Jonathan I. Edelstein_____

                                             JONATHAN I. EDELSTEIN

                                             Attorney for Plaintiff
                                             Edelstein & Grossman
                                             501 Fifth Avenue, Suite 514
                                             New York, NY 10017
                                             (212) 871-0571
                                             (Counsel to be Noticed)

/s/ Robert M. Grossman

ROBERT GROSSMAN

Attorney for Plaintiff
Edelstein & Grossman
501 Fifth Avenue, Suite 514
New York, NY 10017
(212) 871-0571
(PHV)

/s/ Pierre Sussman

PIERRE SUSSMAN

Attorney for Plaintiff
320 Seventh Avenue, # 255
Brooklyn, NY 11215
(347) 987-4725
(PHV)