**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

MICHAEL RHYNES,

|                                     | Plaintiff, | 6:25-cv-6174 |
|---|---|---|
|                                     |            | (ECC/MJK)    |

v.

THE CITY OF ROCHESTER, et al.,

Defendants.

---

Jonathan Edelstein, Esq., *for Plaintiff*
David Rothenberg, Esq., *for Defendant Siragusa*
Alissa Brennan, Esq., *for Defendants Monroe County, Monroe County District Attorney, Stoddart, Garner, and Schafer*
John Campolieto, Esq., *for City Defendants*

**Hon. Elizabeth C. Coombe, United States District Judge, sitting by designation:**

**MEMORANDUM-DECISION AND ORDER**

## I.   INTRODUCTION

Plaintiff Michael Rhynes commenced this action against The City of Rochester; The Rochester City Police Department (RPD); Monroe County District Attorney (MCDA); Monroe County; Cressida A. Dixon, Monroe County Public Administrator, as Temporary Administrator of the Estate of Louis J. Trotto; Cressida A. Dixon, Monroe County Public Administrator, as Temporary Administrator of the Estate of William J. Barnes; Brian Laudadio, Monroe County Public Administrator and Temporary Administrator of the Estate of of Charles R. Schafer; Shelia G. Jackson, as Executrix of the Estate of Julian P. Jackson; Leonard Boriello; Louis J. Rotunno; Lynn R. Prescott; Gary Sextone; Douglas Stoddart; Michael Garner; Charles Siragusa; and John/Jane Doe Nos. 1 through 10, being unknown employees of the City of Rochester and/or Monroe County.  Dkt. No. 51.  Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, as well as state

law, for the alleged deprivation of his rights stemming from his arrest and subsequent convictions, which were later vacated, in state court. *See generally id.*

Presently before this Court are the Defendants' motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6). Dkt. Nos. 39, 42, 46, 47, 48, 69, 70. The motions are fully briefed, Dkt. Nos. 57, 58, 59, 60, 66, 67, 68, 72, 74, and the Court deems oral argument unnecessary. The following constitutes the Court's decision as to the various pending motions.

## II.    FACTS[1]

On September 27, 1984, Enrico Ferrari and Robert Hurysz were shot and killed during the course of an armed robbery by three masked men at Rico's Bar in Rochester, New York. Dkt. No. 51 ¶ 27. At the time of the incident, Plaintiff was sleeping in an upstairs bedroom in his mother's house. *Id.*

An investigation into the incident was conducted by RPD. Dkt. No. 51 ¶ 28. Eyewitnesses described the assailants' clothing, and one eyewitnesses in particular described the assailants as at least six feet tall. *Id.* Plaintiff, who is 5'6" tall, was not identified by the eyewitnesses. *Id.* Nevertheless, Plaintiff appeared on a suspect list prepared the same day, and RPD subsequently prepared memoranda implicating Plaintiff. *Id.* at ¶¶ 29, 31.

Sometime between September 27 and October 3, 1984, RPD's lead investigator, Lieutenant William Mayer,[2] contacted Ali Hasan, a paroled felon and confidential informant. Dkt. No. 51 ¶ 32. Mayer directed Defendant RPD Officers Rotunno, Jackson, and Barnes, and Defendant RPD Detective Trotto, to interview Hasan on September 28. *Id.* at ¶ 35. Jackson and Trotto

---

[1] These facts are drawn from the Second Amended Complaint. Dkt. No. 51. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] Mayer is not a party to this action.

2

subsequently interviewed Hasan at his home, where they showed Hasan a picture of Plaintiff and instructed Hasan to implicate Plaintiff in the robbery. *Id.* at ¶ 36. Jackson and Trotto "fed information" about Plaintiff to Hasan, and coerced Hasan to

> concoct a story about a supposed chance early September 1984 street encounter with three black men, including one he only identified as "Joe-Joe." During this supposed encounter, the three men and Hasan smoked marijuana in Hasan's car and the three men stated that they knew that they could get money from a bar called Rico's.

*Id.* at ¶ 37. In an investigatory memorandum dated October 1, 1984, RPD Officer James Verna[3] recorded that Hasan viewed photos and falsely recorded that Hasan spontaneously identified a photo of Plaintiff as "Joe-Joe." *Id.* On October 3, Rotunno, Jackson, and Trotto met with Hasan and "coerced Hasan to execute an affidavit." Dkt. No. 51 ¶ 38. Jackson ordered Hasan to falsely identify Plaintiff in a photo array, and "falsely recorded [the] meeting in an investigatory memorandum." *Id.*

On October 5, 1984, Jackson, Rotunno, and Defendant RPD Officer Lynn Prescott interviewed Annie Jean Maddox and Vernessa Maddox, who denied having knowledge about the robbery. Dkt. No. 51 ¶ 39. Later at the Rochester Public Safety Building, Jackson, Stewart,[4] Trotto, Prescott and Rotunno used physical violence as well as threats of arrest and the forced removal of Annie Jean and Vernessa's children to coerce them to falsely identify Plaintiff. *Id.* On October 6, Annie Jean and Vernessa signed false statements identifying Plaintiff. *Id.* at ¶ 41. Jackson "falsely recorded the Maddox sisters' identification," Trotto "countersigned Annie Jean Maddox's affidavit," and Rotunno "countersigned Vernessa Maddox's affidavit." *Id.* That day, Trotto, Rotunno and Jackson brought Hasan to RPD headquarters and coerced him to sign an

---

[3] Verna is not a party to this action.

[4] Stewart is not a party to this action.

affidavit identifying Plaintiff as a participant in planning the robbery. *Id.* at ¶ 42. On the basis of these false and coerced identifications, Trotto ordered Plaintiff's arrest. *Id.* at ¶ 43. Sextone, Boriello, and Barnes arrested Plaintiff and charged him accordingly. *Id.*

A grand jury was empaneled on October 6, 1984. Dkt. No. 51 ¶ 45. On October 9, Defendant Monroe County Assistant District Attorney (ADA) Michael Garner "coerced Annie Jean and Vernessa to testify to their false statements." *Id.* at ¶ 45. Garner further knowingly presented the false testimony of Hasan and Jackson to the grand jury. *Id.* at ¶¶ 46-47. On October 12, Plaintiff was indicted for two counts of second-degree murder and five counts of first-degree robbery. *Id.* at ¶ 48. Almost immediately after Plaintiff was indicted Vernessa Maddox recanted both her affidavit and grand jury testimony in a sworn affidavit, recounting the coercion and threats employed by Jackson, Rotunno, and Trotto to force her to sign the false statement. *Id.* at ¶ 49.

On November 25, 1984, Thurmond Dicker was arrested by RPD officers and gave an oral statement describing his involvement in, among other things, the robbery at Rico's Bar. Dkt. No. 51 ¶ 50. Dicker maintained that he had driven the getaway car but had not entered the bar. *Id.* The following day, Defendant ADA Charles Siragusa, in the presence of Defendant RPD Investigator Leonard Borriello, among others, coerced and offered Dicker a plea to lesser charges in exchanged for Dicker's testimony at trial against Plaintiff. *Id.* Garner suspected that Dicker had greater involvement in the robbery at Rico's Bar, and ordered Prescott to examine Dicker under polygraph. *Id.* at ¶ 51. The polygraph results indicated that Dicker had been untruthful as to the extent of his involvement. *Id.*

On March 1, 1985, Borriello and Barnes interrogated and coerced Cleavon Clark, an associate of Dicker, to falsely testify that Clark had planned and prepared for the robbery with Plaintiff, in exchange for non-prosecution of certain crimes. Dkt. No. 51 ¶ 52. "Clark provided

4

the narrative . . . but declined to sign the transcript of his interrogation." *Id.*  On December 20, 1985, Defendant ADA Douglas Stoddart presented Clark with assurances of non-prosecution, and segregation from other individuals who were indicted for the robbery, in exchange for implicating Plaintiff. *Id.* at ¶ 56.  Clark signed the transcript of his interrogation. *Id.* However, at the subsequent trial of one of the co-defendants, Clark recanted his statements under direct and cross-examination. *Id.* at ¶ 57.

At a September 25, 1985 hearing, Garner presented the false testimony of Rotunno and Jackson regarding statements made by Hasan, Anne Jean and Vernessa implicating Plaintiff.  Dkt. No. 51 ¶¶ 53-55.  On October 24, Defendant MCDA Investigator Charles Schafer wrote a memo to Garner stating that Vernessa and Anne Jean were unwilling to talk to representatives from the MCDA's office. *Id.* at ¶ 59.  Schafer subpoenaed Vernessa on February 13, 1986 to testify at one of the co-defendants' trials. *Id.* at ¶ 61.  At the trial, Vernessa recanted her grand jury testimony implicating Plaintiff, and testified that she did not see Plaintiff at or near the time of the robbery. *Id.*

On April 16, 1986, Stoddart consented to Plaintiff's motion to dismiss the indictment, stating that they were left with "insufficient evidence" to try Plaintiff. Dkt. No. 51 ¶ 62.  The state court denied the motion and "directed the People to go ahead regardless." *Id.* at ¶ 63.

In June 1986, Roy Timmons contacted Schafer and offered to "recite untruthfully that [Plaintiff] had confessed his participation in the Rico's Bar robbery and murders" to him while they were confined at the Monroe County Jail. Dkt. No. 51 ¶ 65.  Schafer met with Timmons and "fed Timmons details, which Timmons falsely stated that [Plaintiff] had told to him in jail conversations." *Id.* at ¶ 66.  Schafer "told Timmons that they had nothing on [Plaintiff], and that, if Timmons could put [Plaintiff] as the shooter, he could go home." *Id.* Schafer scheduled a second

5

meeting with Timmons, also attended by Stoddart and Siragusa, among others. *Id.* at ¶ 68. Timmons provided statements that were "fabricated with the active and eager assistance of" Schafer, Stoddart, and Siragusa, among others. *Id.* Schafer, Stoddart, Siragusa and Monroe County District Attorney (DA) Howard Relin arranged for Timmons to be immediately released from the Monroe County Jail in return for his statement and testimony. *Id.* at ¶ 69. The District Attorney ultimately dismissed Timmons' pending robbery charges, and Schafer paid Timmons $150. *Id.*

Joseph Smith contacted DA Relin by letter in June 1986, falsely stating that he had information needed to convict Plaintiff "based on conversation they had purportedly had while he and [Plaintiff] were together at the Monroe County Jail." Dkt. No. 51 ¶ 71. DA Relin dispatched Schafer, among others, to interview Smith. *Id.* Smith "actually did not know anything because Plaintiff [] had not made any admissions to him[.]" *Id.* at ¶ 72. Schafer and other law enforcement officers "fed all the significant details of the crime and [Plaintiff's] false involvement and Smith just agreed to all the suggestions and details provided by Schafer[.]" *Id.* Smith prepared a written statement containing the fabricated information. *Id.* at ¶ 73.

Plaintiff's criminal case was continued, with Rotunno and Jackson falsely testifying at a pretrial hearing. Dkt. No. 51 ¶ 74. Smith and Timmons gave false and perjured testimony against Plaintiff at trial that constituted the "sole evidence" against Plaintiff, and contradicted all other testimony presented at the co-defendants' trials. *Id.* at ¶ 76. At no time did Garner, Stoddart, Schafer, or Siragusa disclose Ali Hasan and Annie Jean Maddox's prior convictions for felony crimes of dishonesty. *Id.* at ¶ 75.

On August 15, 1986, Plaintiff was convicted of four counts of murder in the second degree and five counts of attempted robbery. Dkt. No. 51 ¶ 78. He was sentenced to an aggregate term

6

of incarceration of 50 years to life. *Id.*

On August 16, 2022, Plaintiff filed a C.P.L. § 440.10 motion in state court, arguing among other things that newly discovered evidence mandated vacatur of his conviction. *Id.* at ¶ 79. This evidence included affidavits from Smith and Timmons, affirming that they had lied at Plaintiff's trial about Plaintiff's involvement, and that they were recanting their testimony. *Id.* The affidavits further stated that Smith and Timmons were fed details about the case and told what to say by law enforcement authorities. *Id.* Both Smith and Timmons testified at a hearing on the § 440.10 motion, consistent with their affidavits. *Id.* at ¶ 80. On December 8, 2023, the state court granted Plaintiff's § 440.10 motion and vacated Plaintiff's convictions based on Smith and Timmons' recantations. *Id.* at ¶ 81. Plaintiff was released on his own recognizance on December 19, 2023. *Id.* at ¶ 82. On January 8, 2024, the state court dismissed the indictment against him. *Id.*

## III.    LEGAL STANDARDS

"A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." *Mann v. N.Y. State Ct. of Appeals*, No. 21-cv-49, 2021 WL 5040236, at *3 (N.D.N.Y. Oct. 29, 2021) (citation omitted). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true[ ] and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted).

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). The Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Additionally, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.     DISCUSSION

### A.      County Defendants' Motions

#### 1.      Immunity

##### a.      Sovereign Immunity

Defendants Stoddart and Garner argue that they are entitled to Eleventh Amendment sovereign immunity with respect to any official capacity claims asserted against them. Dkt. Nos. 46-5 at 7; 47-4 at 12. Defendants Monroe County and MCDA argue that Eleventh Amendment sovereign immunity bars any claims Plaintiff purports to assert against DA Relin, who was not individually named as a defendant in this case and never served. Dkt. No. 48-4 at 6-10. In response, Plaintiff contends that Garner, Stoddart, and DA Relin do not enjoy Eleventh Amendment immunity because, as district attorneys, they acted on behalf of the local government rather than the state. Dkt. Nos. 59 at 11; 60 at 11.

"[S]tate governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogate[d] the states' Eleventh Amendment immunity[ ]." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (internal quotation

8

marks and citation omitted, alteration in original). "[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Id*. (cleaned up). Suits against individual defendants sued in their official capacity are treated as suits against the "'entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978)).

"Prosecutors are entitled to Eleventh Amendment immunity when they are acting as state officials rather than city or county employees. When prosecuting a criminal matter on behalf of the state—for example, in 'making an individual decision whether to prosecute'—a district attorney is considered a state official for Eleventh Amendment purposes." *Blessinger v. City of New York*, No. 17 Civ. 108, 2017 WL 3841873, at *2 (S.D.N.Y. Sept. 1, 2017), *aff'd sub nom*. *Byrne v. City of New York*, 736 F. App'x 263 (2d Cir. 2018) (quoting *Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 157 (S.D.N.Y. 2007)). "Thus, if a district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the State, and therefore immune from suit in her official capacity." *D'Alessandro v. City of New York*, 713 F. App'x 1, 8 (2d Cir. 2017); *see also Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993) ("'When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county.'") (quoting *Baez v. Hennessy*, 853 F2d 73, 77 (2d Cir. 1988)); *Ortiz v. City of N.Y.*, No. 04 Civ. 1285, 2005 WL 1837958, at *3 (S.D.N.Y. Aug. 3, 2005) ("Because the District Attorney's Office is acting as an official of the State of New York when it enforces the penal law, it is entitled to absolute immunity from suit" under the Eleventh Amendment).

As an initial matter, the Court agrees that former DA Relin has not been sued as a defendant in this action. According to Plaintiff, DA Relin was the District Attorney of Monroe County from

9

1983 until 2004.  Dkt. No. 51 ¶ 98.  The Second Amended Complaint names "Monroe County District Attorney" as a Defendant, described as "an agency of defendant County existing under and by virtue of the laws of the State of New York, with the powers and duties imposed by law thereon."  *Id.* at ¶ 5.  The Second Amended Complaint further states that "The District Attorney . . . Assistant District Attorneys of Monroe County . . . and District Attorney's Office Investigators are agents and employees of the COUNTY."  *Id.* at ¶ 6.  Although DA Relin's conduct is discussed at length throughout the pleading, he is not specifically identified as a party to this action in the caption, list of parties, or elsewhere.  Nor is DA Relin or the "Monroe County District Attorney" specifically identified in Plaintiff's § 1983 causes of action against the individual County defendants.  *See* Dkt. No. 51 ¶¶ 173-83.  Plaintiff does not address Defendants' argument that DA Relin was never served with process in this action.[5]  Finally, Plaintiff is represented by counsel in this action, and has amended the complaint twice since its inception.  The complaint has not specifically named DA Relin as a defendant in any of its iterations.  *See* Dkt. Nos. 1, 30, 51.  Based on these considerations and a plain reading of the Second Amended Complaint, the Court declines to interpret the Second Amended Complaint to name DA Relin as a defendant.

In any event, the Second Amended Complaint does not distinguish whether the named Defendants are being sued in their individual or official capacities.  Even if the Court were to construe the pleading to assert official-capacity claims against the individually named Defendants, for the reasons set forth above, those claims would be barred by the Eleventh Amendment to the extent they are tethered to the prosecution of Plaintiff's criminal matter.  *See Ying Jing Gan*, 996 F.2d at 536 ("When prosecuting a criminal matter, a district attorney in New York State, acting in

---

[5] According to the docket, the only relevant summons issued was to the "Office of the District Attorney, Monroe County, Monroe County Attorney" at the County Office Building in Rochester, New York.  Dkt. No. 3 at 9.

a quasi-judicial capacity, represents the State not the county.") (internal quotation marks and citation omitted)); *Feerick v. Sudolnik*, 816 F. Supp. 879, 887 (S.D.N.Y. 1993) ("When the [district attorney's office] makes [prosecution-related] decisions, it is acting in a quasi-judicial capacity and thus is representing the state, not the county. Thus, the 11th Amendment protects the [district attorney's office] from Section 1983 liability while it acts as a state representative.") (citation omitted), *aff'd* 2 F.3d 403 (2d Cir. 1993); *Drayton v. Cnty. of Suffolk*, No. 20-cv-4772, 2021 WL 12351672, at *4 (E.D.N.Y. Dec. 10, 2021) ("To the extent that Plaintiff's § 1983 and state law causes of action seek damages against BelCastro and Weiss in their official capacity as assistant district attorneys, such claims are barred by Eleventh Amendment sovereign immunity."); *Mobley v. Rodriguez*, No. 7:25-cv-6784, 2025 WL 3042024, at *3 (S.D.N.Y. Oct. 31, 2025) (collecting cases and concluding that Eleventh Amendment "precludes a plaintiff from seeking, in federal court, relief under state law against a State or one of its agencies or officers sued in his or her official capacity."). Accordingly, to the extent Plaintiff has pled official-capacity claims against Stoddart, Garner, and "Monroe County District Attorney," those claims are dismissed.[6]

---

[6] Even if Plaintiff's official capacity claims against the prosecutor-defendants were not subject to dismissal based on Eleventh Amendment immunity, they would otherwise be dismissed as duplicative of Plaintiff's *Monell* claims against Monroe County. *See Golston v. Cortese*, No. 1:21-cv-914 (GTS/CFH), 2022 WL 2657290, at *5 (N.D.N.Y. Apr. 1, 2022), *report and recommendation adopted*, 2022 WL 2071773 (N.D.N.Y. June 9, 2022) (claims against defendant in his official capacity as county prosecutor should be dismissed because "claims against municipal officers in their official capacities are really claims against the municipality and, thus, are redundant when the municipality is also named as a defendant") (citation omitted); *Greene v. City of N.Y.*, No. 08-cv-243, 2017 WL 1030707, at *29 (E.D.N.Y. Mar. 15, 2017) ("Because any claims against DA Hynes for his role as a 'policymaker' for the KCDA would be duplicative of the plaintiff's claims against the City of New York under *Monell*, those claims are dismissed."); *McCray v. City of N.Y.*, No. 03 Civ. 9685, 2007 WL 4352748, at *26 n.29 (S.D.N.Y. Dec. 11, 2007) ("[T]he Court agrees with DA Defendants that [an official capacity action against DA Morgenthau] would be unnecessarily duplicative of Plaintiff's *Monell* action against the institutional entity of the City of New York").

### b.  Absolute Prosecutorial Immunity

Defendants Stoddart, Garner, Schafer and Siragusa argue that they are immune from suit based on the doctrine of absolute prosecutorial immunity.  Dkt. Nos. 39-2 at 8-13; 46-5 at 7-9; 47-4 at 12-15; 70 at 5-6.  Plaintiff responds that these Defendants are not entitled to absolute immunity for their alleged unconstitutional conduct, which was performed in an investigative capacity.  Dkt. Nos. 57 at 6-11; 59 at 6-11; 72 at 8-13.

"The doctrine of absolute immunity applies broadly to shield a prosecutor from liability for money damages (but not injunctive relief) in a § 1983 lawsuit, even when the result may be that a wronged plaintiff is left without an immediate remedy." *Anilao v. Spota*, 27 F.4th 855, 863 (2d Cir. 2022).  "[P]rosecutors enjoy absolute immunity from § 1983 liability for those prosecutorial activities intimately associated with the judicial phase of the criminal process."  *Id.* at 864 (internal footnote omitted) (quoting *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987)).  "The immunity covers virtually all acts, regardless of motivation, associated with the prosecutor's function as an advocate." *Id*.  The ultimate inquiry is "whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor." *Ogunkoya v. Monaghan*, 913 F.3d 64, 69 (2d Cir. 2019) (quoting *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012)).

Here, the alleged unconstitutional conduct of Stoddart, Garner, Schafer, and Siragusa is appropriately summarized as: coercing false statements and testimony in witness interviews, knowingly presenting false testimony at court proceedings, failing to disclose exculpatory evidence, and serving subpoenas.  At the outset, it is well settled that the failure to disclose exculpatory material, offering of testimony at court proceedings, and conduct surrounding the issuance of court subpoenas is intimately associated with the judicial phase of the criminal process

12

and thus shielded by absolute immunity. *See, e.g., Kweller v. Cnty. of Broome*, No. 3:24-cv-1328 (AJB/ML), 2025 WL 2719897, at *12 (N.D.N.Y. Sept. 24, 2025) ("A prosecutor also 'enjoys absolute immunity for failure to disclose exculpatory evidence, because deciding what disclosure to make is part of a prosecutor's role as advocate, and constitutes a core prosecutorial function.'") (quoting *Schnitter v. City of Rochester*, 556 F. App'x 5, 7 (2d Cir. 2014) (summary order)); *Golian v. N.Y.C. Admin. for Child. Servs.*, 282 F. Supp. 3d 718, 726 (S.D.N.Y. 2017) ("Issuing a subpoena for a witness at a court hearing is plainly part of the prosecutorial function"); *Harris v. Tioga Cnty.*, 663 F. Supp. 3d 212, 239 (N.D.N.Y. 2023) (recognizing that absolute prosecutorial immunity "even shields improper activities, such as the falsification of evidence and the coercion of witnesses, conspiring to present false evidence at a criminal trial, the knowing use of perjured testimony, the deliberate withholding of exculpatory information, and the making or eliciting of false or defamatory statements in judicial proceedings.") (cleaned up).

As for the witness interviews and other investigation allegedly conducted by the prosecutor-defendants, "[i]t is true that 'actions [that a prosecutor] take[s] as an investigator enjoy only qualified immunity.'" *D'Alessandro*, 713 F. App'x at 7 (quoting *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000)). "However, 'not every interview, interrogation, or other act by a prosecutor with the potential of revealing new information is an investigative act.'" *Id.* (quoting *Giraldo*, 694 F.3d at 166). "Specifically, if a prosecutor evaluates evidence and interviews witnesses for the purpose of being an 'effective advocate of a case already assembled,' rather than investigating for the purpose of helping the police identify a suspect and make an arrest, then [his or] her conduct is protected by absolute immunity." *Id.* (quoting *Giraldo*, 694 F.3d at 166); *see also Giraldo*, 694 F.3d at 166 ("Good prosecutors may—usually should—perform acts reasonably characterized as investigative at all phases of a criminal proceeding. The investigative acts that are

13

entitled to only qualified immunity are those undertaken in the phase of law enforcement that involves the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrators.").

Here, there is no allegation that Stoddart, Garner, Schafer or Siragusa was involved in the investigation leading up to Plaintiff's identification and arrest in October 1984. Dkt. No. 51 ¶ 43. The earliest allegation of prosecutorial "investigation" is that Garner met with a witness before the grand jury proceeding, coerced her to give a false statement, and knowingly presented that false testimony to the grand jury. However, Garner's conduct involving the questioning and taking of statements from witnesses prior to and during the grand jury proceeding was taken "not as an investigative matter, but rather to seek an indictment against" Plaintiff. *Tillman v. Hoffman*, No. 23-265, 2023 WL 7180675, at *1 (2d Cir. Nov. 1, 2023); *see id.* (prosecutor who allegedly met with grand jury witnesses before proceedings and knowingly allowed them to present false evidence based on information gathered at meeting was "shielded by absolute immunity"). The remaining alleged investigatory conduct by Stoddart, Garner, Schafer and Siragusa, namely the interviewing of witnesses and coercion of false testimony, took place after the grand jury had assembled and an indictment returned. There is nothing to suggest that these acts were not taken in conjunction with these Defendants' roles in the judicial process, such that absolute immunity would not apply. *See, e.g., D'Alessandro,* 713 F. App'x at 7 (district court properly concluded that prosecutor's investigation taking place after grand jury and assembled and returned an indictment was "reasonably related to [a] decision[ ] whether or not to begin or to carry on a particular criminal prosecution, or to defend a conviction[.]") (citation omitted).

Plaintiff argues that, at a minimum, any "investigatory" conduct undertaken by Stoddart, Garner, Schafer and Siragusa after April 1986 – when the MCDA's office joined Plaintiff's motion

14

to dismiss the indictment – is not covered by absolute immunity, because any probable cause that might have existed had dissipated by that time. The Court disagrees. Notwithstanding the prosecutors' alleged concession, the state court denied the motion to dismiss the indictment and ordered the parties to continue the prosecution. Thus, there is no question that the Defendants' subsequent conduct was taken in the course of preparing for judicial proceedings, and absolute immunity would therefore attach. The caselaw relied on by Plaintiff does not compel a different outcome. For example, in *Thorpe v. County of St. Lawrence,* No. 7:15-cv-736 (GLS/TWD), 2016 WL 7053545 (N.D.N.Y. 2016), the plaintiffs alleged that the defendant-prosecutors coerced a witness to provide false testimony at some point prior to the grand jury proceedings and prior to the plaintiffs' arrest, "suggesting that probable cause was lacking to effectuate an arrest before then." *Id.* at *2. The court declined to dismiss based on prosecutorial immunity, noting that if the defendants coerced the witness's testimony to provide probable cause *for the arrest*, then they would be acting as investigators and not advocates, and would only potentially be entitled to qualified immunity. *Id.* Likewise, in *Hill v. City of New York*, 45 F.3d 653, 662 (2d Cir. 1995), the Second Circuit considered that the allegedly fabricated evidence could have been manufactured prior to, and to provide probable cause for, Hill's arrest.

The majority of remaining authority cited by Plaintiff in support of his opposition does not involve the application of prosecutorial immunity, but the dissipation of probable cause. But his argument misses the mark – the Second Circuit has emphasized that the relevant question is "whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate." *Ogunkoya*, 913 F.3d at 69 (quoting *Warney v. Monroe Cty.*, 587 F.3d 113, 123 (2d Cir. 2009)). Thus, to the extent the MCDA's office is alleged to have been ordered by the state court to advance the criminal case, Stoddart, Garner, Schafer and/or Siragusa's subsequent efforts to

15

prepare the case for trial were necessarily shielded by absolute immunity.

In addition to § 1983 claims, Plaintiff has alleged state-law claims of negligence,[7] false imprisonment, and malicious prosecution against Stoddart, Garner, Schafer and Siragusa. As the Second Circuit has acknowledged, "the principles affording prosecutors absolute prosecutorial immunity from § 1983 claims for damages are the same as those that protect prosecutors from civil liability under state law." *Kweller v. Cnty. of Broome*, No. 3:25-cv-343 (AJB/ML), 2025 WL 3280821, at *9 (N.D.N.Y. Nov. 25, 2025) (citing *Shmueli v. City of N.Y.*, 424 F.3d 231, 237–38 (2d Cir. 2005)). Thus, these Defendants also enjoy absolute immunity from Plaintiff's state-law claims.

Based on the foregoing, Defendants Stoddart, Garner, Schafer and Siragusa's motions to dismiss are granted based on their absolute prosecutorial immunity.

### 2.    *Monell* Liability

Defendants Monroe County and MCDA seek dismissal of Plaintiff's *Monell* claims. Specifically, they argue that the *Monell* claim against MCDA is improper as against the district attorney in his individual capacity, and barred by the Eleventh Amendment to the extent it is asserted as an official-capacity claim. Dkt. No. 48-4 at 10-11. Monroe County and MCDA further argue that Plaintiff fails to state a *Monell* claim as a matter of law, because (1) the district attorney is not a policy maker for the County regarding criminal prosecutions, (2) Plaintiff fails to sufficiently allege a policy or custom, and (3) Plaintiff fails to plausibly allege a *Monell* claim for failure to train, discipline, and/or supervise. *Id.* at 11-20. In response, Plaintiff contends that the Second Amended Complaint alleges that Monroe County "had customs, policies, and/or practices

---

[7] Plaintiff does not oppose dismissal of the negligence claims against Stoddart, Garner, Schafer and Siragusa. Dkt. Nos. 57 at 4; 59 at 4; 72 at 6.

of failure to disclose *Brady/Giglio* material, presenting false testimony at trial, obtaining convictions at all costs including by violating the constitutional rights of defendants, and refusing to discipline prosecutors who had done these things." Dkt. No. 60 at 13.

It is well settled that "a municipality cannot be made liable [under § 1983] by application of the doctrine of respondeat superior." *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quotations omitted). Rather, "[i]n order to hold the County liable under § 1983, plaintiff must put forth sufficient evidence to show that individual defendants' unconstitutional actions were taken pursuant to an official municipal policy, custom, or practice." *Thornton v. Cty. of Albany*, No. 9:14-cv-679, 2016 WL 5793714, *7 (N.D.N.Y. Oct. 4, 2016) (citing *Monell v. Dept. of Soc. Servs. Of City of New York*, 436 U.S. 658, 690–91 (1978)).

"A municipal policy or custom may be established where the facts show (1) a formal policy, officially promulgated by the municipality, *Monell*, 436 U.S. at 690; (2) action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84 (1986); (3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30 (1988); or (4) a failure to train or supervise that amounts to 'deliberate indifference' to the rights of those with whom the municipality's employees interact, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)." *Rivas v. Onondaga Cnty.*, No. 5:19-cv-00844 (BKS/TWD), 2025 WL 2675826, at *16 (N.D.N.Y. Sept. 18, 2025) (internal citations omitted). "To demonstrate *Monell* liability, a plaintiff must allege a violation of constitutional rights by employees of the municipality and (1) the existence of a municipal policy or custom that caused his injuries beyond merely employing the misbehaving officer[s]; and (2) a causal connection - an affirmative link - between the policy and the deprivation of his constitutional rights." *Werkheiser v. Cnty. of Broome*, 655 F.

17

Supp. 3d 88, 109 (N.D.N.Y. 2023) (cleaned up).

### a.     Monroe County District Attorney

Plaintiff failed to respond to the Defendants' argument that his *Monell* claims against MCDA are deficient as a matter of law.  As a general matter, courts in this circuit have concluded that a district attorney's office is "not a separate legal entity capable of being sued pursuant to § 1983." *Douglas v. Albany Police Dep't*, No. 1:24-cv-807 (MAD/PJE), 2026 WL 654374, at *3 (N.D.N.Y. Mar. 9, 2026) (quoting *Griffith v. Sadri*, No. 07-cv-4824, 2009 WL 2524961, *8 (E.D.N.Y. Aug. 14, 2009)); *see also Ali v. Oneida Cnty. Dist. Att'y*, No. 23-cv-1115, 2023 WL 7124513, *6 (N.D.N.Y. Oct. 30, 2023), 2023 WL 7124513, at *4 ("[T]he Oneida County District Attorney's office . . . is not a separate legal entity that is subject to suit, and dismissal is warranted on that basis alone").

Furthermore, as previously discussed the Second Amended Complaint does not plead any claims against DA Relin in his individual or official capacity.  Even if it did, "*Monell* does not apply to individuals who are sued in their individual capacity." *Jackson v. Williams*, No. 18-cv-1137, 2017 WL 1162196, at *3 (N.D.N.Y. Mar. 28, 2017) (quoting *Amory v. Katz*, No. 15-cv-1535, 2016 WL 7377091, at *5 (D. Conn. Dec. 19, 2016)); *see also Shook v. NYS Cent. Reg. of Child Abuse & Maltreatment,* No. 1:24-cv-1218 (AJB/PJE), 2025 WL 1718044, at *7 (N.D.N.Y. June 20, 2025) (collecting cases), *report and recommendation adopted*, 2025 WL 2753667 (N.D.N.Y. Sept. 29, 2025).  Additionally, any official-capacity claims against DA Relin alleging *Monell* liability would be barred by the Eleventh Amendment and otherwise duplicative of Plaintiff's *Monell* claim against Monroe County.  Accordingly, the motion to dismiss Plaintiff's *Monell* claim against MCDA is granted.

### b.    Monroe County's Liability for Prosecutorial Acts

Defendants argue that because the alleged policies complained of were prosecutorial acts, Monroe County cannot be held liable under *Monell* because the district attorney acts on behalf of the state. Dkt. No. 48-4 at 12. "*Monell* claims redress constitutional violations caused by 'local governments,' not states." *Rivas*, 2025 WL 2675826, at \*18 (citing *Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018)). "In searching for the proper local government defendant, courts 'look for those official or governmental bodies who speak with final policymaking authority concerning the action alleged to have caused the particular violation at issue.'" *Id.* (quoting *Bellamy v. City of New York*, 914 F.3d 727, 757 (2d Cir. 2019)). The Second Circuit has "been consistent in holding that the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*, with a narrow exception . . . being the decision of whether, and on what charges, to prosecute." *Bellamy*, 914 F.3d at 759; *see also Ying Jing Gan*, 996 F.2d at 536. When that "narrow exception" applies, "a district attorney in New York 'is not an officer or employee of the municipality but is instead a quasi-judicial officer acting for the state in criminal matters.'" *Anilao*, 27 F.4th at 874 (quoting *Ying Jing Gan*, 996 F.2d at 535–36).

Here, Plaintiff's *Monell* claims are not predicated on the MCDA's decision to prosecute Plaintiff, or the charges chosen. Instead, they concern alleged policies of the MCDA's office, including the failure to disclose *Brady/Giglio* material and presentation of false and misleading testimony at trial. Dkt. No. 51 ¶ 84. "Indeed, the Second Circuit has ascribed a district attorney's conduct to a municipality, rather than the state, in cases involving a prosecutor's office failing 'to adequately train its prosecutors to turn over exculpatory evidence,' and other actions related to 'the administration of the district attorney's office.'" *Rivas,* 2025 WL 2675826, at \*18 (quoting *Bellamy*, 914 F.3d at 758). Accordingly, the relevant conduct here is attributable to the County,

and Defendants are not entitled to dismissal on this basis.

### c.    District Attorney Relin as Policymaker

Monroe County seeks dismissal of Plaintiff's *Monell* claims to the extent they are based on the individual acts of DA Relin.  Dkt. No. 48-4 at 15.  "It is well-established that *Monell* liability attaches "where a single act is taken by a municipal employee who, as a matter of [s]tate law, has final policymaking authority in the area in which the action was taken.'" *Galgano v. Cnty. of Putnam*, No. 16-cv-3572, 2020 WL 3618512, at \*11 (S.D.N.Y. July 2, 2020) (quoting *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008)); *see also Walton v. Safir*, 122 F. Supp. 2d 466, 477 (S.D.N.Y. 2001) ("[T]he act of an official with final decision-making authority, if it wrongfully causes the plaintiff's constitutional injury, may be treated as the official act of the municipality. . . .") (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)) (citations omitted).  "Where a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992); *see Anilao,* 774 F. Supp. 2d at 496 n.27 ("[G]iven the many allegations in the [a]mended [c]omplaint regarding the personal involvement of the District Attorney, municipal liability in this case against the County can also be based upon [his] alleged role as the final policymaker.").

Nevertheless, to impose *Monell* liability under this theory Plaintiff must allege facts establishing that the final policymaker was personally involved in an alleged constitutional violation.  Here, Plaintiff has failed to allege any such facts as to DA Relin.  According to the Second Amended Complaint, DA Relin (1) subpoenaed Victoria Maddox to testify at Plaintiff's co-defendant's trial, where she recanted her statement implicating Plaintiff under his direct examination, Dkt. No. 51 ¶ 61; (2) arranged for Timmons to be immediately released from the Monroe County Jail, and dismissed Timmons' pending robbery charges, in exchange for

20

Timmon's statement and testimony implicating Plaintiff, *id.* at ¶ 69; and (3) received a letter from Smith indicating that Smith had information to convict Plaintiff, and subsequently dispatched his investigator to the facility where Smith was detained to conduct an interview, *id.* at ¶ 71. None of these acts, on their own, plausibly allege a violation of Plaintiff's constitutional rights. Although Plaintiff alleges that the statements from Timmons and Smith were coerced and false, DA Relin is not alleged to have participated in any of the interviews or prepared any of the allegedly false statements. At most, DA Relin is alleged to have acted in reliance on the improper conduct of his subordinates, which is insufficient to attribute liability to DA Relin or to Monroe County under this theory of liability. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) ("Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy."). Accordingly, Plaintiff's *Monell* claims premised on DA Relin's alleged constitutional violations as a final policymaker fail to state a claim for relief. *See e.g., Genao v. City of New York*, No. 1:20-cv-4872, 2022 WL 845750, at *5 (S.D.N.Y. Mar. 22, 2022) (dismissing *Monell* claims premised on defendant's actions "in her capacity as the final municipal policymaker" where Plaintiff failed to plead defendant's personal involvement in any of the alleged constitutional violations giving rise to the action); *Kinsella v. Inc. Vill. of E. Hampton*, No. 15-cv-3948, 2021 WL 11633992, at *17 (E.D.N.Y. Dec. 6, 2021) (plaintiffs failed to establish *Monell* violation based on the acts of an individual with policymaking authority where, among other things, plaintiff failed to put forth evidence that defendants "had any direct involvement with, knowledge, or responsibility for the alleged deprivation of Plaintiff's civil rights").

### d.    Persistent and Widespread Practices

Monroe County argues that Plaintiff failed to sufficiently allege that a policy or custom

21

was created by a "persistent and widespread practice" of prosecutorial misconduct for purposes of establishing *Monell* liability.  Dkt. No. 48-4 at 13-16.  "To show a policy or custom through a 'widespread practice,' a plaintiff must attribute a subordinate's conduct to the actions or omissions of higher-ranking officials with policymaking authority." *Miller v. Cnty. of Monroe*, No. 23-cv-06649, 2024 WL 2804435, at *4 (W.D.N.Y. May 31, 2024) (citing *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (citations omitted). To do so, a plaintiff may show that (i) a "policymaker ordered or ratified the subordinate['s] actions, or (ii) "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty America*, 361 F.3d at 126.  A plaintiff may also plead the existence of de facto customs or policies "by citing [ ] complaints in other cases that contain similar allegations." *Gaston v. Ruiz*, No. 17-cv-1252, 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018).  "Such complaints should involve factually similar misconduct, be contemporaneous to the misconduct at issue in the plaintiff's case, and result in an adjudication of liability." *Miller*, 2024 WL 2804435, at *4 (citing *Isaac v. City of New York*, No. 16-cv-4729, 2018 WL 5020173, at *17 (E.D.N.Y. Aug. 6, 2018) (finding that other court cases could not establish a de facto policy or custom because they involved dissimilar misconduct, were resolved by settlement, or the city prevailed); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) ("None of the [16] lawsuits cited resulted in an adjudication or admission of liability and the number of suits does not suggest a pervasive illegal practice."); and *Buari v. City of New York*, 530 F. Supp. 3d 356, 404 (S.D.N.Y. 2021)).

Here, Plaintiff has alleged the existence of a "widespread practice" of prosecutorial misconduct by citing "complaints in other cases that contain similar allegations."  *Gaston*, 2018 WL 3336448, at *6.  In the Second Amended Complaint, Plaintiff alleges that Monroe County had

22

customs, policies and/or practices of failing to disclose *Brady/Gigio* material, presenting false testimony at trial, "obtaining convictions at all costs including by violating the constitutional rights of defendants,' and refusing to discipline prosecutors who engaged in such conduct.  Dkt. No. 51 ¶¶ 84-86, 99, 100-01, 109, 124.  Plaintiff's allegations identify multiple incidents of misconduct by different county actors over the course of his criminal prosecution.

In opposition to the Defendants' motion to dismiss, Plaintiff argues that he has plausibly alleged a *Monell* claim under the "persistent and widespread" practices theory of liability to the extent he has identified multiple, similar incidents of prosecutorial misconduct occurring both in his own criminal action, and the approximately thirty-one cases involving prosecutorial misconduct spanning from 1979 to 2017 identified in the Second Amended Complaint.  Dkt. No. 48-4 at ¶¶ 118, 120, 121.  The majority of the other cases referenced in the Second Amended Complaint involve summation misconduct and/or prosecutor's prejudicial remarks and conduct at trial, with only approximately ten cases referencing *Brady* violations of any kind, which occurred over a thirty-five-year period.  As a general matter, the Court is not persuaded that the limited number of other cases referenced, having occurred over the course of over three decades, plausibly allege that a practice of committing *Brady/Giglio* violations or presenting perjured testimony at trial was  "'so widespread as to have the force of law,' *Bd. of Cnty. Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404 (1997) (citations omitted), or 'so manifest as to imply the constructive acquiescence of senior policy-making officials,' *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 871 (2d Cir. 1992) (citations omitted)." *Miller*, 2024 WL 2804435, at *6 (W.D.N.Y. May 31, 2024), *see id.* (seven cited cases of misconduct occurring over a thirty-year period insufficient to establish that improper practice was so widespread as to have the force of law); *see also Buari*, 530 F. Supp. 3d at 406 (same where twenty-three cited cases of misconduct

occurred over a twenty-year period); *Felix v. City of New York*, 344 F. Supp. 3d 644, 659 (S.D.N.Y. 2018) (same where ten civil rights complaints occurred over the course of thirty years).

However, courts in this circuit have recognized *Monell* claims to be sufficiently pled when based on the additional consideration of multiple, similar incidents of misconduct alleged in the plaintiff's own case. *See DiPippo v. Cnty. of Putnam,* No. 17-cv-7948, 2019 WL 1004152, at *9 (S.D.N.Y. Feb. 28, 2019) (noting "numerous examples from within the Second Circuit in which the district court allowed a *Monell* claim to survive where the Plaintiff alleged only a few examples of similar misconduct," coupled with Plaintiff's own allegations) (collecting cases); *Tyus v. Newton*, No. 3:13-cv-1486, 2015 WL 1471643, at *11 (D. Conn. Mar. 31, 2015) (denying motion to dismiss *Monell* claim "[i]n view of the number of alleged unconstitutional traffic stops, searches, and arrests involving the plaintiff and at least one other individual prior to the incidents involving the plaintiff"); *Michael v. County of Nassau*, 2010 WL 3237143, *4 (E.D.N.Y. Aug. 11, 2010) (denying dismissal of claim against County based on a policy or custom or failure to train where "[p]laintiff has not alleged one isolated incident of police misconduct . . . . [rather, he] has alleged multiple incidents over a long, continuous time period.").

Here, Plaintiff has pled sufficient facts to allege an unlawful pattern or practice within his own criminal prosecution and more broadly in Monroe County. Specifically, Plaintiff alleges that the continued use of perjured and/or knowingly false testimony throughout his criminal prosecution by various personnel within the MCDA's office, along with the failure to disclose exculpatory evidence as to several state witnesses, resulted in the violation of his constitutional rights. The Court also considers this in conjunction with the former MCDA's alleged admission that the office lacked a formal process to track impeachment evidence at the time of Plaintiff's criminal prosecution. At this stage of the litigation, this suffices to create the plausible inference

that Monroe County had an informal policy or custom. Accordingly, Defendants' motion to dismiss Plaintiff's *Monell* claim on this basis is denied.

### e.        Failure to Train, Discipline, and/or Supervise

Monroe County and MCDA argue that Plaintiff has failed to plausibly allege a *Monell* claim under a failure to supervise/discipline theory, because he has not sufficiently alleged "a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity," or that Monroe County "consistently failed to investigate the allegations." Dkt. No. 48-4 at 17. Defendants further argue that Plaintiff has failed to plausibly allege that Monroe County was on actual or constructive notice of a particular omission in the MCDA's office training program, and nonetheless chose to retain the program. *Id.* at 18-19.

"A *Monell* claim may also be established by showing a 'deliberate indifference' to a risk that a recurring situation will likely result in a constitutional violation." *Owens v. Cnty. of Monroe*, No. 21-cv-6445, 2021 WL 6113950, at *5 (W.D.N.Y. Dec. 27, 2021) (citing *Davis v. City of New York*, 75 F. App'x 827, 829 (2d Cir. 2003) (summary order)). A plaintiff must plead the following to establish that a municipality's failure amounts to deliberate indifference:

> (1) policymaker of the municipality knows to a moral certainty that its employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.

*Young v. Cnty. of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998) (citing *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal quotations and alterations omitted)).

Here, Plaintiff has satisfied the three requirements under *Walker* for purposes of alleging deliberate indifference. First, Plaintiff has established that the district attorney's office "plainly knew, to a moral certainty, that ADAs would make probable cause assessments, offer testimonial

25

evidence in court, confront false or misleading testimony, and acquire *Brady* material 'because these are basic facets of an ADA's job.'" *Buari*, 530 F. Supp. 3d at 406 (quoting *Bertuglia v. City of New York*, 839 F. Supp. 2d, 703 738 (S.D.N.Y. 2012) (citing *Walker*, 974 F.2d at 300)). Second, Plaintiff has plausibly alleged that "the 'situation' in his case presented difficult choices 'of the sort that training or supervision will make less difficult.'" *Miller,* 2024 WL 2804435, at * 7 (quoting *Walker*, 974 F.2d at 293). "While the Court recognizes that certain types of prosecutorial misconduct are 'so obvious to require no training[,]' such as suborning perjury or fabricating evidence, the duty to avoid *Brady* violations is not so obvious or easy to [observe] as to require, as a matter of law, no training or supervision.'" *Id.* (quoting *Walker*, 974 F. 2d at 300). "Finally, it is reasonable to infer that a failure to discipline [or train] prosecutors in connection with prosecutorial misconduct, including the failure to disclose *Brady* information, would cause constitutional violations." *Owens,* 2021 WL 6113950, at *6 (citing *Buari*, 530 F. Supp. at 406); *see also Walker*, 974 F.2d at 300 ("[W]ithholding *Brady* material will virtually always lead to a substantial violation of constitutional rights."); *Bertuglia*, 839 F. Supp. 2d at 739 ("[W]here an assistant district attorney commits misconduct . . . or violates their obligations under *Brady*, those actions will frequently result in the violation of citizens' constitutional rights.").

Two similar but distinct theories of recovery are available to a plaintiff asserting municipal liability based on a showing of deliberate indifference: failure to supervise/discipline and failure to train. *See Amnesty America*, 361 F.3d at 127. "To establish *Monell* liability for a failure to supervise or discipline, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Miller,* 2024 WL 280 4435, at *8 (citing *Tieman v. City of Newburgh*, No. 13-cv-4178, 2015 WL 1379652, at *21-22 (S.D.N.Y. Mar. 26,

26

2015)). "A need for greater supervision or discipline 'may be demonstrated through proof of repeated complaints of civil rights violations" that are not followed by a "meaningful attempt . . . to investigate or to forestall further incidents.'" *Id.* (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)); *see also Treadwell v. Cnty. of Putnam*, No. 14-cv-10137, 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016).

"To establish Monell liability for a failure to train, a municipality may be liable 'when city policymakers are on actual or constructive notice that a particular omission in their training program causes [ ] employees to violate citizens' constitutional rights . . . [but] the policymakers choose to retain that program.'" *Miller,* 2024 WL 2804435, at * 8 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "A failure to train constitutes a policy or custom under § 1983 only where 'in light of the duties assigned to [. . .] employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

A plaintiff must "identify a specific deficiency in [a defendant's] training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Alwan v. City of New York*, 311 F. Supp. 3d 570, 579 (E.D.N.Y. 2018) (quoting *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007)). A plaintiff "need only plead [a municipality's] failure to train caused the constitutional violation" because "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." *Amnesty America*, 361 F.3d at 130 n.10. Nevertheless, courts still require that a plaintiff "provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train.'" *Tieman*, 2015 WL 1379652,

27

at \*22 (collecting cases); *see Collins v. City of New York*, 923 F. Supp. 2d 462, 478 (E.D.N.Y. Feb. 15, 2013) (noting that under *Iqbal*, a plaintiff "must allege, not only a viable [failure to train] theory, but facts that render the theory plausible"). Accordingly, a plaintiff must "allege facts that support an inference that the municipality failed to train its [employees], that it did so with deliberate indifference, and that the failure to train caused his constitutional injuries." *Tieman*, 2015 WL 1379652, at \*22 (collecting cases).

At this juncture, Plaintiff's allegations are sufficient to plausibly allege *Monell* liability under a failure to supervise, discipline and/or train theory. Specifically, Plaintiff has pled that at the time of his trial, the Monroe County District Attorney's office admittedly had "no process in place" to "track impeachment evidence concerning prosecution witnesses." Dkt. No. 51 ¶ 107. Plaintiff further alleges that, in this regard, the Monroe County District Attorney's Office failed to properly train or supervise its prosecutors "who withhold exculpatory evidence and/or impeachment materials, in violation of *Brady* [and] *Giglio*." *Id.* at ¶ 133. Finally, Plaintiff has plausibly alleged that the failure to train or supervise prosecutors as to the proper disclosure of exculpatory evidence and/or impeachment materials resulted in the underlying Constitutional violations. *Id.* at 140. For these reasons, Plaintiff's *Monell* claim survives under this theory of liability, and Monroe County's motion to dismiss on this basis is denied.

### 3.    Negligent Supervision, Retention, Training

Defendants Monroe County and MCDA argue that Plaintiff's state-law negligent hiring, retention, and/or supervision claim should be dismissed. Dkt. No. 48-4 at 20-21. In response to this argument, Plaintiff indicates that he "does not oppose dismissal of his claim of negligent hiring, retention and supervision" against Monroe County and MCDA. Dkt. No. 60 at 8. Accordingly, the unopposed motion to dismiss this claim is granted.

28

### B.     City Defendants' Motion

#### 1.     § 1983 Pleading Deficiencies against Individual Defendants

The City Defendants argue that Plaintiff's § 1983 claims against the individual Defendants (First Cause of Action) should be dismissed because it "fails to identify any specific actions of defendants resulting in any particular injury to plaintiff," and that the allegations are "non-specific lumping the . . . named Rochester Police Officers as if they are a single officer." Dkt. No. 42-3. In response, Plaintiff denies that the Second Amended Complaint includes "catchall" or "group pleading," and contends that the First Cause of Action is sufficiently pled to satisfy *Twombly* and *Iqbal*. Dkt. No. 58 at 10-14.

Plaintiff's First Cause of Action asserts § 1983 claims under the Fourth, Sixth, and Fourteenth Amendments for malicious prosecution, deprivation of liberty without due process of law, denial of the right to a fair trial, and failure to intervene against Trotto, Rotunno, Prescott, Jackson, Barnes, Boriello and Sextone. Dkt. No. 51 ¶¶ 142-52. Plaintiff specifically articulates the impermissible conduct he attributes to each of the individual Defendants by name, and in some instances multiple individual Defendants are alleged to have engaged in the same or similar conduct. *Id.* at ¶ 143(a)-(l). Moreover, the First Cause of Action specifically references that it repeats and realleges the preceding allegations, which provide an even more detailed narrative and notice of the conduct at issue. *Id.* at ¶ 142. Based on these observations, the Court rejects the City Defendants' argument that Plaintiff's allegations in the First Cause of Action are vague or non-specific. As Plaintiff notes, the City Defendants conflate impermissible "group pleading" and "catch-all" allegations with a pleading that alleges misconduct attributable to more than one defendant. Plaintiff's allegations, although perhaps numerous, are explicitly tied to the conduct of one or more named individual defendants, and thus permissibly pled under the standards

29

promulgated by *Twombly* and *Iqbal.*[8]

It is also unclear how the First Cause of Action is "duplicative of plaintiff's more specifically [pled] § 1983 claims for violation of federal rights," as the City Defendants suggest. Dkt. No. 42-3 at 6. The Second Amended Complaint, which is now the operative pleading and against which the Defendants agreed to have their motions to dismiss assessed, does not contain any duplicative federal civil rights claims against the individual City Defendants under § 1983. To the extent the City Defendants are referring to Plaintiff's state-law false imprisonment and malicious prosecution claims enumerated in the Sixth and Seventh Causes of Action, those claims are not impermissibly duplicative and may be properly pled in conjunction. *See Adams v. City of Syracuse*, No. 21 Civ. 650, 2022 WL 685286, at *5 (N.D.N.Y. Mar. 8, 2022) (treating state law false arrest claim "as synonymous" with federal law false arrest claim and declining to dismiss state law false arrest claim as duplicative).

For all of the above reasons, the City Defendants' motion to dismiss on this basis is denied.

### 2. *Monell* Liability

The City Defendants seek dismissal of Plaintiff's *Monell* claim to the extent it is premised on "widespread and persistent" acts of its subordinates and/or failure to train, discipline and/or supervise law enforcement officers.[9] Dkt. No. 42-3 at 7-12. Specifically, the City Defendants

---

[8] The City Defendants also complain that Plaintiff's First Cause of Action includes allegations against the John Doe Defendants. Dkt. No. 42-3 at 5. It is unclear how this observation is relevant to the City Defendants' request for dismissal, as the John Doe Defendants have not appeared in this action, are not represented by counsel of record, and do not seek relief in the pending motion. Nor does their inclusion in any of the allegations contained in the First Cause of Action prevent the individual City Defendants from determining whether the allegation at issue is specifically tied to *their own* conduct, *i.e.* whether they are specifically identified by name.

[9] Plaintiff contends that the City Defendants' brief only seek dismissal of his *Monell* claim premised on a failure to train, and thus his alternative theory of *Monell* liability premised on "widespread and persistent" acts of subordinates must survive the motion to dismiss. Dkt. No. 58 at 15. Although the City Defendants' brief is not a model of clarity, and appears to conflate its

argue that Plaintiff failed to allege a pattern of similar violations which could have put policymakers on notice of a need for more or different training, and that Plaintiff's reference to a limited number of cases identifying constitutional violations occurring over the span of forty-plus years is insufficient to make out a *Monell* claim. *Id.* In response, Plaintiff argues that the Court can and should consider the multiple alleged unconstitutional acts that occurred in Plaintiff's own case in conjunction with the other cases cited in the Second Amended Complaint when assessing the pervasiveness of the unconstitutional conduct. Dkt. No. 58 at 16-18. Plaintiff further argues that the limited number of similar cases cited should not be dispositive of his *Monell* claim at the pleading stage. *Id.* at 18-21.

For substantially the same reasons enumerated in the Court's analysis of Plaintiff's *Monell* claims against Monroe County, the City Defendants' motion to dismiss Plaintiff's *Monell* claims is denied. Plaintiff has alleged that during the course of RPD's investigation into the incident at Rico' Bar, at least eight RPD officers and investigators engaged in multiple instances of misconduct, including fabricating false identifications and evidence, perjury, and failure to investigate or disclose exculpatory evidence. Again, because Plaintiff has not merely alleged an isolated incident of constitutional violations, but multiple examples of misconduct by several officers over a continuous period of time, he has adequately pled a *Monell* claim at this stage of the litigation. *See DiPippo*, 2019 WL 1004152, at \*9 (denying a motion to dismiss and noting "a *Monell* claim, based on a widespread custom or policy, must be context-specific and cannot be reduced to an overly simplistic analysis of the number of instances alleged"); *see also Michael*, 2010 3237143, at \*4–5 (allowing municipal liability claim to proceed where the allegations

---

arguments seeking dismissal on these separate bases, the Court considers the City Defendants' motion to seek dismissal of the *Monell* claim under both theories of liability, and will assess the arguments accordingly.

consisted of "multiple incidents over a long, continuous period of time" that involved "multiple officers"); *Bertuglia*, 839 F. Supp. 2d at 738 (denying the City's motion to dismiss where the plaintiff "points to over fifteen cases where City prosecutors allegedly committed misconduct, and alleges the existence of many more such cases in the form of unpublished opinions").  The City Defendants' motion to dismiss on this basis is therefore denied.

### 3.  § 1983 Conspiracy

The City Defendants raise a fleeting argument that Plaintiff's § 1983 conspiracy claim fails as a matter of law because Plaintiff's allegations (1) "do not meet the initial pleading standards" of a § 1983 conspiracy claim, and (2) "do not meet the statue of limitations of a [1983] or state action[.]"  Dkt. No. 42-3 at 13.  In response, Plaintiff contends that the entirety of the factual allegations in the Second Amended Complaint sufficiently allege that the "defendants agreed to and did work together in inter alia fabricating evidence, coaching and coercing witnesses, [and] presenting perjured testimony[.]"  Dkt. No. 58 at 21-22.

With respect to the insufficient pleading argument, it is entirely unclear on what basis – state action, meeting-of the-minds, or otherwise – the City Defendants contend that Plaintiff's allegations fail to plausibly allege a claim for § 1983 conspiracy.  The City Defendants only state that Plaintiff's allegations "do not meet the initial pleading standards[.]"  Dkt. No. 42-3.  "It is not this Court's responsibility to do counsel's work for them by scouring the record to determine whether counsel's conclusory arguments hold water."  *Murray v. Coleman*, No. 08-cv-6383L, 2014 WL 2993748, at *7 (W.D.N.Y. July 2, 2014) (citing, among others, *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005) ("merely including an issue within a list [is not] adequate briefing")).  Accordingly, to the extent the City Defendants' motion rests on the conclusory statement that Plaintiff's factually-complicated § 1983 conspiracy claim is deficiently

pled, it is denied. *See Nevelskiy v. Advanced Pro. Grp., Inc.*, 735 F. Supp. 3d 148, 161 (E.D.N.Y. 2024) ("[I]t is not the Court's responsibility to make the [defendant's] arguments, especially since the [defendant] is represented by counsel."); *Murray*, 2014 WL 2993748, at *7 ("If the [defendant] is serious about the motion, it must make the necessary effort.").

The City Defendants alternatively argue that Plaintiff's § 1983 claim is untimely, however their largely incoherent argument lacks any support by or reference to relevant legal authority. The City Defendants make no effort to articulate or analyze how the accrual period for the three-year statute of limitations for § 1983 conspiracy claim comports with the underlying facts and alleged constitutional violations. For the reasons previously expressed, the Court declines to make the City Defendants' argument for them. Accordingly, the motion to dismiss Plaintiff's § 1983 conspiracy claims based on timeliness is denied.

### 4.   State Law False Imprisonment and Malicious Prosecution

The City Defendants argue that Plaintiff's state-law false imprisonment and malicious prosecution claims should be dismissed as untimely, on the basis that the appropriate statute of limitations period is "the one year and 90-day limitations period set forth in General Municipal Law, rather than one-year general statute of limitations for assault, false imprisonment, and malicious prosecution claims, applied to plaintiffs' claims against city and other municipal defendants based on allegations of intentional tortious conduct." Dkt. No. 42-3. However, the City Defendants entirely fail to articulate *how* the one year and 90-day statute of limitations period renders Plaintiff's state law claims untimely. In response, Plaintiff agrees that the relevant statute of limitations period is one year and 90 days. Dkt. No. 58 at 23-24. Plaintiff further contends that both his false imprisonment and malicious prosecution claims are timely, to the extent this action was commenced within one year and 90 days of the date the underlying charges against him were

33

dismissed. *Id.* In the absence of any argument from the City Defendants explaining why the longer statute of limitations renders Plaintiff's state-law claims subject to dismissal, their motion on this basis is denied.

### 5. State Law Negligence and Negligent Hiring

The City Defendants seek dismissal of Plaintiff's negligence and negligent hiring claims for failure to state a claim. Dkt. No. 42-3 at 14-17. In response, Plaintiff states that he "does not oppose dismissal of [his] Eighth and Tenth Causes of Action (negligence and negligent hiring) as against the City Defendants." Dkt. No. 58 at 2. Accordingly, the City Defendants' unopposed motion to dismiss Plaintiff's negligence and negligent hiring claims is granted.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant Siragusa's motion to dismiss, Dkt. No. 39, is **GRANTED,** and Plaintiff's Second Amended Complaint is **DISMISSED** as against Defendant Siragusa based on his absolute immunity from suit; and it is further

**ORDERED** that Defendant Stoddart's motion to dismiss, Dkt. No. 46, is **GRANTED in part,** and the Second Amended Complaint is **DISMISSED** as against Defendant Stoddart based on his absolute immunity from suit; and it is further

**ORDERED** that Defendant Garner's motion to dismiss, Dkt. No. 47, is **GRANTED in part**, and the Second Amended Complaint is **DISMISSED** as against Defendant Garner based on his absolute immunity from suit; and it is further

**ORDERED** that Defendant Schafer's motion to dismiss, Dkt. Nos. 69, 70, is **GRANTED in part**, and the Second Amended Complaint is **DISMISSED** as against Defendant Schafer based on his absolute immunity from suit; and it is further

**ORDERED** that Defendants Monroe County and Monroe County District Attorney's motion to dismiss, Dkt. No. 48, is **GRANTED in part and DENIED in part;** and it is further

**ORDERED** that Defendants Monroe County and Monroe County District Attorney's motion to dismiss is **GRANTED** to the extent that

(1) the Second Amended Complaint is **DISMISSED** against Defendant Monroe County District Attorney,

(2) Plaintiff's *Monell* claim against Defendant Monroe County premised on District Attorney Relin's conduct as policymaker is **DISMISSED**, and

(3) Plaintiff's state-law negligent hiring, retention, and/or supervision claim against Defendant Monroe County is **DISMISSED;** and it is further

**ORDERED** that Defendants Monroe County and Monroe County District Attorney's motion to dismiss is in all other respects **DENIED;** and it is further

**ORDERED** that the City Defendants' motion to dismiss, Dkt. No. 42, is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that the City Defendants' motion to dismiss is **GRANTED** to the extent that

(1) Plaintiff's state-law negligence claims against the individual City Defendants are **DISMISSED**, and

(2) Plaintiff's state-law negligent hiring, retention, and/or supervision claims against Defendants City of Rochester and Rochester Police Department are **DISMISSED;** and it is further

**ORDERED** that the City Defendants' motion to dismiss is in all other respects **DENIED.**

**IT IS SO ORDERED.**

Dated: August 5, 2026

Elizabeth C. Coombe
U.S. District Judge

35